UNITED STATES of America,
Appellee–Cross–Appellant,

v.

Felix FRIEDMAN, Lawrence Tinnirello, Paul Tinnirello, Lorenzo Gregory, a/k/a "Fat Larry," Frank Mucchiello, a/k/a "Frankie Mooch," Joseph DiSomma, a/k/a "Joe Diamonds," Francis Tinnirello, Michael Pugliese, and Charles Lachterman, a/k/a "Charlie Lucky," Defendants,

Charles Lachterman, Defendant–Appellant,

and

Joseph DiSomma, Defendant–Appellant–Cross–Appellee.

Nos. 617, 446, 467, Dockets 92–1373, 92–1274, 92–1306.

United States Court of Appeals, Second Circuit.

Argued Nov. 30, 1992.

Decided June 10, 1993.

James B. Comey, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty. for the S.D.N.Y., Andrew C. McCarthy, Asst. U.S. Atty., New York City, of counsel), for appellee-cross-appellant.

Linda Imes, Richards Spears Kibbe & Orbe, New York City (Michele R.M. Campbell, Debevoise & Plimpton, New York City, of counsel), for defendant-appellant Charles Lachterman.

Joann Harris, New York City, for defendant-appellant-cross-appellee Joseph DiSomma.

Before: OAKES and WINTER, Circuit Judges, and CONBOY,* District Judge.

WINTER, Circuit Judge:

This appeal by Charles Lachterman and Joseph DiSomma[1] involves questions regarding the applicability of U.S.S.G. § 2X1.1 to Hobbs Act convictions, a sentencing court's degree of discretion in applying an obstruction of justice enhancement when the jury has necessarily concluded that the defendant lied at trial, and the proof sufficient to establish that predicate acts are related to a criminal RICO enterprise.

---

\* The Hon. Kenneth Conboy, U.S. District Judge for the Southern District of New York, sitting by designation.

1. This is a consolidated appeal involving appellants Lorenzo Gregory and Paul Tinnirello, as well as Lachterman and DiSomma. However, we have affirmed Gregory's and Tinnirello's appeal by summary order pursuant to our Rule § 0.23.

We affirm in part, vacate in part, and remand for resentencing.

## DISCUSSION

These appeals arise from convictions following a government investigation into the criminal activities of the "Friedman/Tinnirello Organization." Viewing the evidence in the light most favorable to the government, the following facts were established at trial. Since 1983, the Friedman/Tinnirello group, operating from a variety of retail stores and jewelry booths in Manhattan's 47th Street jewelry district, fenced hundreds of thousands of dollars worth of stolen personal property and jewelry. Members of the group also maintained a steady supply of jewelry through a wide variety of robberies, burglaries, and fraudulent schemes. The nucleus of the group consisted of three brothers, Lawrence, Paul, and Francis Tinnirello, as well as Felix Friedman, Joseph DiSomma, and Lorenzo Gregory. This opinion concerns only the activities of Joseph DiSomma (Tinnirello's cousin) and Charles Lachterman, *see* Note 1 *supra*, who were convicted for their roles in the organization.

### A. *Joseph DiSomma*

In the fall of 1989, Lawrence Tinnirello, Lawrence Taylor, and Richard Skowronski conspired to rob the Telco Jewelry store where Skowronski worked. *United States v. Skowronski,* 968 F.2d 242 (2d Cir.1992). The government alleges that Joseph DiSomma, Skowronski's closest friend, was part of this conspiracy and was instrumental in its planning. The store carried between $200,000 and $300,000 in inventory and was equipped with a safe and a metal roll-down gate which covered the storefront at closing. Between Thanksgiving and Christmas, the period of the conspiracy, the store also employed security guards during the evening hours of business. The plan called for the robbers to enter the Telco store after the exterior window gates had been closed for the day and "clean ... the whole ... place out."

Government wire-taps revealed that on November 18, Tinnirello and Taylor discussed the proposed robbery. Tinnirello indicated that he would "check ... out" the Telco store, pretending to be an ordinary customer, and that they would "move" if the store contained at least $200,000 in jewelry. Two days later, Tinnirello left a message on DiSomma's answering machine saying that he wanted "to meet Richie [Skowronski] this week and take a look at that thing." DiSomma returned the call, saying that he had spoken with Skowronski about the plan. The two agreed that they should meet with Skowronski after Thanksgiving. On November 27, Tinnirello informed DiSomma that he and Taylor would check out the Telco store the following day, but would warn Skowronski of their planned visit. DiSomma added that Skowronski should not greet them, thereby revealing that he knew them, but should just "be cool" when they arrived at the store.

On Thanksgiving morning, Tinnirello recruited Charles Lachterman, a professional thief, for the robbery, saying:

> I got an inside guy that works somewhere. The same thing that me and you are into.... Its just him and two girls, and he wants to take the whole ... place.... I already, right, have two guys.... Now my friend works in there. You understand? So it's a setup. Ya put the ... gate down, ya take the showcases, the .... vault, and leave.

On December 13, attempting to prevent the robbery, FBI agents visited Skowronski, accused him of planning to rob the Telco store, and implied that one of his associates had informed on him. Skowronski asserted his innocence, denied knowledge of any wrongdoing, and the agents left. Skowronski drove to a phone booth, made three phone calls, and returned home. Shortly thereafter, DiSomma arrived at Skowronski's residence. The two drove to a pay phone booth and called Tinnirello. DiSomma told Tinnirello that "[w]e got trouble" and urged him to "go out to a pay phone and call me back." Tinnirello protested that he had no car available and asked what was wrong. DiSomma answered that there was trouble for them and Skowronski, but told Tinnirello to keep quiet. When Tinnirello insisted his phone was not tapped and pressed DiSomma for details, DiSomma refused to disclose more, saying only that the situation was seri-

ous and that Tinnirello must get to a pay phone.

Later that day, DiSomma and Tinnirello spoke of the FBI's visit to Skowronski and the possibility that Skowronski would cooperate with the government. DiSomma argued that Skowronski would not cooperate because he is a "stand-up kid." DiSomma later advised Tinnirello that he had taken care of Skowronski's nervousness. Two days later, DiSomma told Tinnirello in a coded conversation that Skowronski's co-worker at the Telco Jewelry store had been contacted by the FBI but that "everything is good." Tinnirello conveyed that DiSomma should dispose of his firearm, and DiSomma replied that both he and Skowronski already had.

DiSomma was later arrested and charged with RICO conspiracy and substantive offenses, a Hobbs Act violation, and mail fraud. A jury convicted him only on the Hobbs Act charge. He attacks this conviction as unsupported by the evidence, violative of his due process rights, and improper because the lower court should have dismissed the charge for lack of venue. He also challenges the sentencing court's three-point addition for possession of a firearm in connection with the robbery conspiracy. We affirm.

The government cross-appeals DiSomma's sentence, arguing that the district court improperly applied U.S.S.G. § 2X1.1 and improperly considered the obstruction of justice enhancement as discretionary. We agree and remand for resentencing.

DiSomma argues that the evidence does not support his conviction under the Hobbs Act. First, he claims that there is insufficient evidence of any conspiracy at all. The wiretaps, in his view, record only Tinnirello's rambling, incoherent monologues and not a conspiracy joined by others. He next argues that, even if Tinnirello and others were planning a robbery, there is insufficient evidence that he was involved. DiSomma characterizes his phone calls to Tinnirello as part of his effort to help his cousin through a difficult time. As for the references to "the thing" involving Telco Jewelry, DiSomma claims that it is just as likely that he was simply directing Tinnirello and Taylor to Telco in order to facilitate a legitimate jewelry pur-

chase. He claims Taylor was looking for a diamond engagement ring and that he referred him to Skowronski for the purchase. He also argues that his incriminating phone calls to Tinnirello following the FBI visit may be equally well understood as reflecting his concern over unrelated schemes.

■ DiSomma mistakes our task on appeal. DiSomma's testimony was submitted to the jury who weighed it and found it wanting. It is not for us to weigh, as DiSomma would have us, "competing inferences and explanations" about which explanation is more likely. *United States v. Stanley*, 928 F.2d 575, 577 (2d Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991). We cannot reverse a conviction merely because the defendant's exculpatory account is plausible. Rather, we must affirm so long as, drawing all inferences in the government's favor, a reasonable jury might fairly have found DiSomma guilty beyond a reasonable doubt. *See United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986). The evidence here was sufficient.

■ First, we have already rejected Skowronski's challenge as to the sufficiency of the evidence as to the Telco conspiracy. *Skowronski*, 968 F.2d at 247–48. We therefore obviously reject DiSomma's first contention that the evidence will not support the finding of conspiracy; at the very least, Skowronski and Tinnirello could be found to have actively conspired to rob the store.

■ Second, DiSomma's challenge to the evidence of his involvement is similarly unsuccessful. After establishing the existence of the Telco scheme, the government presented evidence that DiSomma: set up a meeting with Skowronski and Tinnirello to talk about the plan, warned Tinnirello not to visit the store without first warning Skowronski, and made incriminating phone calls to Tinnirello upon learning of the FBI's visit to Skowronski. This evidence was more than sufficient to allow the jury to conclude that DiSomma was one of the "two [other] guys" with whom Tinnirello and Skowronski were conspiring to rob the store.

In addition to this affirmative evidence of guilt, the jury was entitled to draw negative inferences from DiSomma's testimony at trial. *United States v. Eisen*, 974 F.2d 246, 259 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993). "By taking the stand and offering his own version of events, [DiSomma] ' "waive[s] any claim as to the sufficiency of the Government's case considered alone." ' " *United States v. Roldan–Zapata*, 916 F.2d 795, 803 (2d Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991) (quoting *United States v. Tyler*, 758 F.2d 66, 69 (2d Cir.1985)) (citations omitted). DiSomma's testimony was, as Judge Cedarbaum found, "entirely incredible." In light of the government's evidence, the jury was entitled to conclude that DiSomma's version of the events was false and thereby infer his guilt. *United States v. Marchand*, 564 F.2d 983, 985–86 (2d Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978). In short, there is substantial evidence that DiSomma was part of a conspiracy to rob the Telco Jewelry store.

DiSomma next argues that his conviction must be reversed because the conspiracy did not contemplate a real, but only a "fake" robbery. Skowronski's cooperation, he claims, meant that no property would be taken from "or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury." 18 U.S.C. § 1951(b)(1). We rejected this argument in Skowronski's appeal and need not discuss it here. *Skowronski*, 968 F.2d at 248.

DiSomma also objects to being tried in the Southern District. He claims that the conspiracy's sole connections to the district were phone calls from Tinnirello, in Long Island, to Lachterman, in Manhattan. According to appellant, when the Hobbs Act charge against Lachterman was dropped after trial, the conspiracy's ties to the Southern District were severed and venue was thereafter improper. We disagree.

Title 18 U.S.C. § 3237(a) (1988) provides for venue in a district where the evidence establishes that an offense was begun or continued. The phone calls alone establish this venue in the Southern District. The fact that no Manhattan resident was convicted for participating in the conspiracy is irrelevant for the purposes of the statute. Simply put, the phone calls were sufficiently probative of a conspiracy to establish venue, although not sufficiently probative to establish Lachterman's guilt beyond a reasonable doubt. *See United States v. Nicoll*, 664 F.2d 1308, 1311 (5th Cir.) (holding that, when venue hinges largely on phone calls to alleged coconspirator, acquittal of coconspirator does not defeat venue), *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982), *overruled on other grounds by United States v. Henry*, 749 F.2d 203, 206 (5th Cir.1984); *United States v. Sandy*, 605 F.2d 210, 217 (6th Cir.), *cert. denied,* 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979).

Finally, DiSomma appeals the district court's calculation of his sentence. Judge Cedarbaum found that the conspirators actually possessed guns for use in the robbery and therefore added three points to DiSomma's offense level. U.S.S.G. § 2B3.1(b)(2)(C) (1989); *see also* U.S.S.G. § 2X1.1 Application Note 2 (indicating that the enhancement can apply to robbery conspiracies). DiSomma claims that the evidence in this case is too weak to justify this enhancement. We disagree and have already rejected a similar appeal by appellant's coconspirator, Richard Skowronski. *Skowronski*, 968 F.2d at 248–49.

The government, on cross-appeal, also challenges DiSomma's sentence. It claims that Judge Cedarbaum wrongly awarded a three-point reduction under U.S.S.G. § 2X1.1. We agree. *United States v. Skowronski*, 968 F.2d 242 (2d Cir.1992), decided after the sentencing by Judge Cedarbaum, held that Section 2X1.1 did not apply to defendants convicted of a Hobbs Act conspiracy. *Id.* at 249. DiSomma's sentence should therefore be recalculated in light of our opinion in *Skowronski*.

The government also contends that Judge Cedarbaum wrongly withheld a two-point enhancement for obstruction of justice. DiSomma testified that he was completely uninvolved in the robbery conspiracy, was simply trying to help Taylor get a diamond

engagement ring, was trying to help Tinnirello through a difficult time, and that his panicked telephone calls to Tinnirello (following the FBI visit to Skowronski) reflected only his concern over unrelated schemes. DiSomma denied any involvement in or knowledge of a robbery conspiracy, portraying himself in his brief as one who had done well for a kid, in his legitimate little business which he enjoyed.

The jury obviously disagreed. Moreover, the jury's guilty verdict, in light of DiSomma's complete denial, necessarily constitutes a finding that DiSomma lied about material facts. Judge Cedarbaum apparently concurred, calling DiSomma's version of the facts "entirely incredible" and describing it as a "false statement under oath." She also stated that she had "no doubt" that testimony was not believable.

Nevertheless, Judge Cedarbaum declined to impose a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1, given to those who commit perjury. She indicated that she could "simply [choose] not to" apply the enhancement, in contrast to enhancements such as that for weapons enhancement, which must be applied if the court found the appropriate factual predicate. In short, Judge Cedarbaum apparently declined to impose the obstruction of justice enhancement on the belief that the enhancement was discretionary. We disagree.

The obstruction of justice enhancement, like the weapons enhancement charge, is mandatory once its factual predicates have been established. "Upon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *United States v. Dunnigan*, —— U.S. ——, ——, 113 S.Ct. 1111, 1119, 122 L.Ed.2d 445 (1993).

Under the criminal perjury statute, 18 U.S.C. § 1621 (1988), a witness commits perjury "if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *Dunnigan*, —— U.S. at ——, 113 S.Ct. at 1116. DiSomma denied all involvement in the conspiracy. This was obviously testimony about a material fact that both the judge and jury considered false. We therefore vacate DiSomma's sentence and remand for more specific factual findings as to whether or not DiSomma committed perjury.

### B. *Charles Lachterman*

Appellant Charles Lachterman is a professional thief who, since 1987, allegedly supplied the enterprise with stolen property to fence. On June 27, 1989, Lachterman was caught stealing jewelry from a Manhattan apartment. Following the arrest, Paul Tinnirello posted bail and Lachterman was released. Lachterman jumped bail but continued his close association with members of the group, with whom he continued to plan jewel thefts. There was evidence that, in November and December of 1989, Lachterman conspired with Lawrence Tinnirello to defraud a merchant for "nine, ten grand" by duping the merchant with a fake ruby. The two also plotted a residential theft in Brooklyn, and Tinnirello proposed that Lachterman join the Telco robbery conspiracy.

Lachterman's collaboration with the group was long-lasting and based on mutual profit from stolen jewelry. Lachterman spent so much time at the group's jewelry booth that Friedman and Lachterman both told others that Lachterman worked there. In addition, Lachterman reported to Lawrence Tinnirello before going out to steal, telling him when he would bring the proceeds to 47th Street. Government wire-taps reveal that when Lawrence Tinnirello was not actively fencing stolen jewelry, he told Lachterman that he hoped to return to 47th Street soon and "work with you just like I was working with you before."

Lachterman was eventually arrested for robbery in 1990 after he was caught stealing $18,000 worth of jewelry. When arrested, Lachterman was carrying lock picks, mace, the phone numbers of Friedman, the Tinnirellos, and Joseph DiSomma, and a piece of paper which the government argues reflects his bail-debt to Paul Tinnirello. The paper indicated that the debt had been reduced from $3500 to $3400.

In this case, Lachterman was charged with participation in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d), a substantive RICO violation pursuant to 18 U.S.C. § 1962(c), participation in the Telco conspiracy in violation of the Hobbs Act, 18 U.S.C. § 1951, and possession of a gun in violation of 18 U.S.C. §§ 922(g)(1) and (3). Convicted only of the RICO offenses, he was sentenced to ·135 months imprisonment, three years supervised release, and restitution in the amount of $10,000.

Lachterman challenges both convictions on the grounds that his two charged thefts were insufficiently related to the Friedman/Tinnirello criminal enterprise. He also attacks his sentence on the grounds that he should have been awarded reductions for accepting responsibility and playing only a minor role in the enterprise. We disagree.

■ Lachterman argues that his RICO convictions must be set aside because there is no evidence that his crimes were part of or tied to the core Friedman/Tinnirello enterprise. Rather, he portrays himself as a solo burglar with little connection to the organized ring. We disagree.

It is clear that Lachterman was systematically and actively associated with the enterprise. In November 1989, Friedman and Tinnirello discussed Lachterman's relative productivity over the previous two years, clearly referring to his role as a professional jewel thief and his productivity in their fencing operation. Moreover, government phone-taps reveal that Lachterman and Tinnirello planned a number of crimes, discussed Lachterman's ongoing efforts to steal jewels and disclosed that Lachterman reported to Tinnirello before going out on "jobs." The same wiretaps reveal that Lachterman even kept Tinnirello apprised of the activities of other criminals who might infringe on the group's territory.

Given this record of association and collaboration, a reasonable jury could draw the following inferences. As to Lachterman's first predicate act, the 1989 burglary, the jury could conclude that Paul Tinnirello's willingness to pay Lachterman's bail was an explicit acknowledgement that Lachterman was working for the Friedman/Tinnirello enterprise at the time. It is not at all unreasonable to infer such a connection when a major fence posts (and forfeits) bail for a professional jewel thief.

The jury was similarly entitled to infer that Lachterman's second predicate act, the 1990 robbery, was connected with and related to the enterprise. Lachterman's notes at the time of his arrest entitled the jury to conclude that Lachterman was then indebted to Paul Tinnirello for the bail money. Lachterman's statements indicated that his only job was·stealing jewels and therefore such a theft was the only means by which he could repay the debt. Moreover, the government presented evidence that, on·other occasions, Lachterman planned jewel thefts in order to pay off debts to the enterprise's members. When Tinnirello recruited Lachterman for the Telco robbery, Lachterman was current only on his interest payments for his bail-debt to Paul Tinnirello. Tinnirello offered to let Lachterman participate because he knew Lachterman "need[ed] the money." · Lachterman agreed that they would "work somethin' out" because he hadn't been able to steal much lately, had borrowed money from DiSomma, and needed to do "something" to get money. In short, the jury heard evidence that Lachterman had earlier agreed to participate in a jewel theft in order to repay members of the organization. It was therefore permissible for the jury to infer that Lachterman similarly planned the 1990 robbery in order to fence the jewels through the organization and pay off his debt. In short, the evidence was more than enough to allow the jury to conclude·that both Friedman and Lachterman told the truth when·they represented that Lachterman worked for the group.

Of course, these are not the only inferences that might be drawn from these events. However, we must draw all inferences in favor of the government, *Stanley,* 928 F.2d at 576, and need not exclude "every possible hypothesis of innocence." *United States v. Soto,* 716 F.2d 989, 993 (2d Cir.1983). Because the evidence would allow a rational juror to find Lachterman guilty, we will not disturb the verdict on appeal. Lachterman is simply unable to bear the very heavy

burden required for a successful reversal. *See United States v. Maldonado–Rivera*, 922 F.2d 934, 978 (2d Cir.1990), *cert. denied,* ⸺ U.S. ⸺, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991).

Lachterman also challenges his sentence, arguing that he is entitled to a reduction for acceptance of responsibility because he plead guilty to a state charge based on his 1989 arrest for burglary. We disagree.

First, Judge Cedarbaum was unpersuaded that Lachterman merited a reduction even if the charge were simply the 1989 burglary, let alone the RICO charges, because he had refused to "come forward" and, by his actions, show "clear acceptance of responsibility." Judge Cedarbaum was "in a unique position to evaluate [Lachterman's] acceptance of responsibility," U.S.S.G. § 3E1.1 Application Note 5, and found that Lachterman failed to exhibit an affirmative acceptance of responsibility. Her finding is entitled to deference on review and will not be overturned because it is not clearly erroneous. *Id.*

Finally, Lachterman argues, and the government concedes, that when the district judge considered U.S.S.G. § 3B1.2(b), she used two different standards interchangeably, confusing minor with minimal participation. Lachterman asks that we remand for clarification of this issue. We agree.

Section 3B1.2(b) of the Sentencing Guidelines awards a two-level reduction to a minor participant, whom the Application Notes define as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." Minimal participants, as defined for Section 3B1.2(a), are those who are "plainly among the least culpable." U.S.S.G. § 3B1.2(a) Application Note 1. Thus, in the nomenclature of this section, minor participants fall somewhere between minimal participants and ordinary ones.

Nevertheless, the court's discussion conflated the categories minimal and minor, blurring the distinction between Section 3B1.2(a) and (b). In ruling that Lachterman was not entitled to a minor role adjustment, the court stated that "not everybody is either a leader or a minimal participant. That is, there are foot soldiers. Most people are neither mini-

mal nor major participants.... There has to be something specific that distinguishes either a minimal or a major player." The court later stated that it did not

> view Mr. Lachterman as playing a minimal role in the sense that I understand minor role or minimal role under the guidelines.... Unless the conduct is truly peripheral to the activity of the group, ... I don't think minimal role is appropriate. Perhaps you are trying to persuade me, for example, that because Mr. Lachterman executed robberies on his own, that is, by himself, that makes him minimal. But in terms of group activity, I don't think that was minimal conduct.

The government argues that, after this initial confusion, the judge nevertheless applied the correct standard. This may be true, but we cannot be certain that this was an inadvertent misstatement that did not affect the sentence. *See United States v. Lopez,* 937 F.2d 716, 728 (2d Cir.1991). We therefore vacate Lachterman's sentence for a determination of whether he is entitled to a reduction for a minor role.

Affirmed in part, vacated in part, and remanded.