119 F.3d 217
 UNITED STATES of America, Appellee,
v.
Frank DESIMONE, Sr.; Thomas Gagliardi, aka "Tommy"; Louis
Esa, aka "A.J. Duhe", aka "John McQuire", aka "Louis";
Felix Nunez; Earl Reynolds, aka "Robert Reynolds", aka
"Bob", aka "Boo-Boo"; Carl Rogasta, aka "Carmen Vignola",
aka "Carlo"; Robert Santora, aka "Robert Amato"; Richard
Sinde, aka "Richie", Defendants,
Pablo Fernandez, Defendant-Appellant.
 No. 440, Docket 96-1023.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 11, 1996.
Decided July 28, 1997.
 
 Jeremy G. Epstein, New York City (Harmeet K. Dhillon, Shearman & Sterling, New York City, of counsel), for Appellant Pablo Fernandez.
 Allen D. Applbaum, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney, Craig A. Stewart, Assistant United States Attorney, Southern District of New York, New York City, of counsel), for Appellee United States of America.
 Before: CARDAMONE, MAHONEY,* Circuit Judges, and RESTANI**, Judge.
 CARDAMONE, Circuit Judge:
 
 
 1
 Defendant Pablo Fernandez appeals from a December 22, 1995 judgment of the United States District Court for the Southern District of New York (Sprizzo, J.) convicting him of one count of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846. Fernandez' primary challenge on appeal is that the evidence presented was insufficient to support his conviction. He uses this argument as a platform from which he mounts a variety of other challenges to his conviction and sentence; each additional argument depends to some degree on our assessment of the sufficiency of the evidence. That is, it is basically the same argument clothed in different verbal garb. Consequently, because defendant fails to establish that the evidence was deficient, each of the additional, dependent arguments must also fail.
 
 BACKGROUND
 
 2
 An undercover investigation of Louis Esa, who was the alleged leader of a widespread criminal enterprise engaged in counterfeiting, credit card fraud, narcotics distribution, and other crimes, led FBI agents to arrest Ronald Besho, one of Esa's counterfeiting coconspirators. In exchange for a reduced sentence recommendation on counterfeiting charges, Besho agreed to arrange a narcotics transaction with Esa. During the ensuing investigation most of Besho's telephone conversations and many of his face-to-face encounters with the alleged coconspirators were recorded.
 
 
 3
 At the behest of FBI agents Besho called Esa in December 1991 saying that his friend, "Mike," wanted to purchase cocaine. Esa responded that a person named "Pablo" could supply it. On January 6, 1992 Besho and Esa met at Esa's brother's Manhattan apartment to discuss the proposed transaction. While they talked, Esa packaged three ounces of cocaine into gram bags for street sales, telling Besho that the cocaine had come from defendant Pablo Fernandez, and that Fernandez was expecting another "20 to 30 keys" shortly. Esa stated that defendant planned to give him ten kilograms "to move."
 
 
 4
 After the January 6 meeting, Esa relocated to Florida, but continued to speak periodically by telephone with Besho. In a conversation recorded on January 14, Esa advised Besho to call Fernandez to find out the price of the cocaine. When Besho asked what his "cut" would be, Esa said he expected to split the profits from the sale with Besho. In a telephone conversation three days later, Esa coached Besho on what to say during the negotiation with Fernandez and instructed him to "get the price, ... make our money, and ... send me my money." On the afternoon of January 20 Besho told Esa that he planned to meet Fernandez later that day, and Esa cautioned him not to bring "Mike" to the meeting for fear that Mike and Fernandez might cut Besho out of the deal.
 
 
 5
 Later that day Besho, Fernandez, and "Chino," an associate of Fernandez, met at the Columbus Restaurant on Manhattan's Upper West Side. Besho testified that Fernandez agreed to supply five kilograms of cocaine at a price of $16,500 per kilogram and that they had devised a plan for the exchange: Mike would drive the cash for the purchase to a nearby location in his car, and Chino and Fernandez would bring the cocaine in a different car. Besho and Fernandez would then meet at the restaurant, reveal the location of their respective cars, and conclude the transaction by exchanging cars.
 
 
 6
 The next day, January 21, Besho and Fernandez spoke briefly by phone. Fernandez warned Besho, in code, that he might not be able to provide cocaine at the price quoted the day before, but promised to call the next day with a definite price. Besho and Esa talked on the telephone three times that day. In the first two conversations, they discussed the deal in general terms. During the third call, Esa advised Besho that it would be safer to exchange only one kilogram of cocaine at a time, rather than delivering the cash for all five kilograms at once.
 
 
 7
 In a series of telephone conversations on the evening of January 21 and the morning of January 22, Fernandez confirmed that he would have to charge $17,000 per kilogram, rather than the $16,500 promised on January 20. Besho initially rejected the higher price, but later told Fernandez that "Mike" still wanted to go ahead with the deal. On January 22 Besho met again with Fernandez and Chino at the Columbus Restaurant to consummate the sale. After Besho assured Fernandez that he had the money nearby, Fernandez sent Chino to get the cocaine. About 20 minutes later, Fernandez told Besho that Chino was nervous about bringing the cocaine to the Upper West Side, and that Besho should instead bring the cash to Washington Heights, where Chino would meet him with the cocaine. Besho called the undercover agent posing as "Mike," who directed him not to travel to Washington Heights. Thus, the planned exchange did not take place.
 
 
 8
 When Besho called Esa the next day, January 23, to explain why the deal had fallen through, Esa suggested that Besho enlist the aid of Felix Nunez. Nunez agreed, at the request of Besho and Esa, to mediate and told Besho to arrange a meeting with Fernandez at noon the following day. Fernandez and Besho met on January 24 to discuss the problem. Over the course of the following week, Besho, Fernandez, Esa and Nunez continued to discuss the deal, although no money or narcotics ever changed hands. In a telephone conversation on January 27, Esa told Besho that Fernandez and Nunez suspected that Besho was an informant. Later that day, Nunez called Besho and then put Fernandez on the line to talk to Besho about the proposed sale.
 
 
 9
 On January 29 Besho had a three-way conversation with Fernandez and Esa. They discussed Fernandez' fear that Besho was a cop or an informant, and Fernandez again urged Besho to complete the five-kilogram sale in Washington Heights. Esa urged Besho to agree to Fernandez' plan. In the end, however, the transaction was never consummated because Besho adamantly refused to travel to Washington Heights and Fernandez just as adamantly refused to make the exchange anywhere else.
 
 
 10
 Fernandez, Nunez, Esa and others were eventually charged in a multi-count indictment alleging multiple acts of narcotics conspiracy and trafficking, robbery, credit card fraud, counterfeiting, and forgery. On February 15, 1994 Judge Sprizzo granted Fernandez' motion to sever Count 19, the only count in which appellant was named. Following a three-day jury trial, Fernandez and Nunez were convicted of conspiring to violate federal narcotics laws, in violation of 21 U.S.C. § 846. Fernandez was later sentenced to 121 months imprisonment, to be followed by five years supervised release and a mandatory $50 special assessment. From this conviction, Fernandez appeals. We affirm.
 
 DISCUSSION
 I Conspiracy
 A. Standards of Proof for Conspiracy
 
 11
 Appellant argues first that the evidence presented at trial was insufficient to show either that a conspiracy existed or that he intended to sell narcotics to Besho. A defendant seeking to overturn a conviction on the grounds that the evidence was insufficient bears a heavy burden. United States v. Russo, 74 F.3d 1383, 1395 (2d Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996); United States v. Wallace, 59 F.3d 333, 338 (2d Cir.1995). A conviction challenged on sufficiency grounds will be affirmed if, viewing all the evidence in the light most favorable to the prosecution, a reviewing court finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir.1992). A reviewing court must view the evidence as a whole, see United States v. Casamento, 887 F.2d 1141, 1156 (2d Cir.1989), and give deference to the jury's resolution of the credibility of witnesses where there is conflicting testimony. See United States v. Pelaes, 790 F.2d 254, 259 (2d Cir.1986). Further, the government's proof need not exclude "every possible hypothesis of innocence." United States v. Friedman, 998 F.2d 53, 59 (2d Cir.1993) (internal quotations omitted).
 
 
 12
 In order to prove a conspiracy, the government must show that two or more persons agreed to participate in a joint venture intended to commit an unlawful act. See United States v. Martino, 664 F.2d 860, 876 (2d Cir.1981). Because a conspiracy requires the participation of at least two culpable co-conspirators, United States v. Hendrickson, 26 F.3d 321, 333 (2d Cir.1994), it follows that "[a] person who enters into such [a conspiratorial] agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a bona fide co-conspirator." United States v. Vazquez, 113 F.3d 383, 387 (2d Cir.1997).
 
 
 13
 The existence of--and a particular defendant's participation in--a conspiracy may be established entirely by circumstantial evidence. See United States v. Gordon, 987 F.2d 902, 907 (2d Cir.1993). Moreover, the conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement, see id. at 906, and the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it, see United States v. Sureff, 15 F.3d 225, 228-29 (2d Cir.1994) (upholding conspiracy conviction where cocaine never explicitly mentioned, no drugs seized, and no direct testimony as to drug transactions).
 
 
 14
 An individual defendant's membership in a conspiracy may not be established simply by his presence at the scene of a crime, nor by the fact he knows that a crime is being committed. Instead, membership requires proof of purposeful behavior aimed at furthering the goals of the conspiracy. See United States v. Torres, 901 F.2d 205, 220 (2d Cir.1990). Once the existence of a conspiracy has been shown, it does not take overwhelming proof to link additional defendants to it. See Casamento, 887 F.2d at 1156.
 
 
 15
 B. Conspiracy Standards Applied to Instant Case
 
 
 16
 Appellant contends the government did not prove there was an agreement between him and any of the alleged coconspirators. The government concedes that as a government informant Besho cannot be considered a culpable coconspirator. Fernandez maintains that the proof before the jury was also insufficient to support a finding that he entered into an agreement with either Esa or Nunez.
 
 
 17
 1. Agreement with Esa. Fernandez asserts no conspiratorial agreement existed between him and Esa because Esa's role was simply to introduce Besho to him. For this proposition, he relies on United States v. Tyler, 758 F.2d 66, 69 (2d Cir.1985) and United States v. Hysohion, 448 F.2d 343, 347 (2d Cir.1971), where we held that a defendant is not a party to a conspiratorial agreement simply because he introduced a person willing to buy drugs to another person willing to sell them.
 
 
 18
 In Tyler we reversed the conspiracy conviction of a defendant who introduced an undercover officer to a drug dealer from whom the officer subsequently purchased heroin. 758 F.2d at 70. In reaching that result, we observed that proof that Tyler asked the buyer how much heroin he wanted, that Tyler knew where to obtain heroin and that he knew anything about the seller or his whereabouts was "conspicuously absent." Id. at 68-69. Each of the factors "conspicuously absent" in Tyler is present in this case. When Besho initially told Esa that he was looking for between two and ten kilograms of cocaine for "Mike," Esa recommended that Besho purchase the cocaine from appellant and told Besho how to contact him. Esa professed intimate knowledge of Fernandez' narcotics operation, including details of a substantial shipment of cocaine expected by Fernandez in January 1992. Esa related this information to Besho while he was packaging gram bags of cocaine, which he explained came to him from Fernandez.
 
 
 19
 The inference that there was an agreement between Fernandez and Esa was bolstered by Esa's continued involvement in the deal after introducing Besho to Fernandez. Taken in the light most favorable to the government, the evidence showed that Esa acted as both an advisor to Besho and a mediator between Besho and Fernandez as they attempted to consummate the narcotics sale. Esa monitored Besho's progress with Fernandez through regular telephone conversations and maintained independent contact with both Nunez and Fernandez to discuss the proposed transaction. In the January 29 three-way telephone conversation between Esa, Besho and Fernandez, Esa urged Besho to agree to Fernandez' proposal to complete the sale in Washington Heights.
 
 
 20
 Later, in a final attempt to resolve the conflict between Fernandez and Besho, Esa invited Nunez to help broker the deal. The evidence further demonstrated that Esa's assistance was offered not as a favor, but with an expectation of compensation from the profits of the cocaine sale. Esa's financial stake in the outcome of the negotiations constituted proof of his interest in furthering the goals of the conspiracy. Based on this evidence, the jury could reasonably have concluded that Esa and Fernandez had a tacit agreement to bring about the sale of five to ten kilograms of cocaine to Besho.
 
 
 21
 2. Agreement with Nunez. Fernandez also contends that the government failed to prove the existence of an agreement between Nunez and himself. Although the agreement between Esa and Fernandez is sufficient to affirm Fernandez' conspiracy conviction, we briefly address this additional contention. The government's evidence, appellant believes, simply proved that Nunez and appellant acted as "freelance competitors" for Besho's business. While this may be one plausible view of the evidence, it is not the only one. Several of the taped conversations indicated that Nunez was working with Fernandez, not competing against him. For example, on January 23, Nunez advised Besho that he could be contacted through Fernandez. On January 27 Nunez and Fernandez were together when they called Besho to discuss the deal--Nunez placed the call then handed the receiver to Fernandez. In a telephone conversation taped on January 29 Nunez explained to Besho that although he would have preferred to supply the cocaine for the deal himself, he didn't want "to go over Pablo[ Fernandez'] head." Nunez then described a conversation with Fernandez in which "Pablo said we going [sic] to do it together because he didn't know you ... and I know you and I say [sic] OK." Thus, a jury could reasonably have inferred from both the substance and the circumstances of the taped conversations that appellant and Nunez had entered into an agreement to sell cocaine to Besho.
 
 C. Defendant's Ability to Supply Cocaine
 
 22
 Appellant next maintains that the prosecution failed to show that he was actually capable of supplying "five kilograms and more of cocaine," as alleged in the indictment. As a preliminary matter, we note that because the particular quantity of narcotics is not an element of the offense, a jury's verdict will be upheld where there is evidence that the defendant conspired to sell any quantity of an illegal narcotic substance. See United States v. Jacobo, 934 F.2d 411, 415 (2d Cir.1991). Fernandez urges that the government's failure to seize or produce any cocaine proves the defense theory that the cocaine negotiations were designed to lure Besho to Washington Heights with a large amount of cash so that he and his associates could rob Besho of the money, not sell him cocaine. Again, while a jury could have credited the defendant's theory that he intended to rob Besho, the evidence does not compel such a finding.
 
 
 23
 Fernandez' capacity and intent to deliver the promised quantity of cocaine could, for example, have been inferred from Esa's claim that the three ounces of cocaine he was repackaging on January 6 came from Fernandez, or from Esa's further statement that Fernandez was expecting an additional shipment of 20-30 kilograms that month. The tapes established that Esa and Fernandez knew each other, and the evidence was sufficient to allow the jury to rely on Esa's statements--as Esa was shown to be familiar with the nature and extent of Fernandez' criminal activities--at least with regard to the sale of narcotics. While Fernandez' stubborn insistence on having Besho bring a large amount of cash to Washington Heights could be interpreted as an attempt to maneuver Besho to a convenient location for a robbery, it could also support a finding that Fernandez was an experienced dealer who, though cautious, was nonetheless ready and willing to complete the sale. Faced with competing reasonable inferences drawn from the evidence, we are required to defer to the jury's resolution implicit in its guilty verdict.
 
 
 24
 Appellant's insistence that the government is or ought to be held to a higher standard of proof where the negotiated quantity of narcotics is not delivered or seized is similarly without merit. We have explicitly rejected the notion that circumstantial evidence is inherently weaker than direct evidence. Sureff, 15 F.3d at 229. A narcotics conspiracy may be established entirely by circumstantial evidence if, from inferences fairly drawn, the jury could have found beyond a reasonable doubt that the defendant was guilty of the criminal conduct charged against him. Id. at 228. We believe the quantity and quality of evidence of Fernandez' agreement with Esa and Nunez and his capacity to provide the negotiated amounts of cocaine amply supported defendant's conviction.
 
 II Multiple Conspiracy Charge
 
 25
 Building from his assertion that the government failed to show an agreement between him and any of the alleged coconspirators, Fernandez declares that the court erred in failing to include a multiple conspiracy charge in its jury instructions. Before turning to the merits, we consider the appropriate standard of review.
 
 
 26
 Ordinarily, when a criminal defendant fails to object to a perceived trial error an appellate court will review that issue only for plain error. Fed.R.Crim.P. 52(b). This rule also applies where a defendant seeks reversal on the ground that a trial court failed to give a jury instruction that was not specifically requested. See United States v. Lanese, 890 F.2d 1284, 1290 (2d Cir.1989) (citing Fed.R.Crim.P. 30). Appellant concedes he did not request a multiple conspiracy charge, but avers that because his codefendant, Nunez, unsuccessfully sought such an instruction, his failure to object ought to be excused. See United States v. Ghazaleh, 58 F.3d 240, 244 (6th Cir.1995) (declining to limit consideration of court's failure to give multiple conspiracy instruction to plain error review where codefendant's unsuccessful objection could reasonably have led defendant to believe that separate motion was futile), cert. denied, --- U.S. ----, 116 S.Ct. 716, 133 L.Ed.2d 669 (1996). Because appellant's claim of error would fail under either de novo or plain error review, we need not resolve the waiver issue.
 
 
 27
 In addition, although Fernandez frames the alleged error as a failure to give a multiple conspiracy instruction, the structure of his argument and the precedents cited in his brief suggest that his argument is perhaps more appropriately characterized as an assertion of an impermissible variance between the conspiracy alleged in the indictment and the conduct proved at trial. While a defendant's failure to object may waive his right to a multiple conspiracy instruction, even where one is warranted, a conviction will be reversed where the defendant can show that (1) the indictment charged a single conspiracy, but the proof disclosed several independent conspiracies, and (2) defendant was so prejudiced by this variance as to be denied a fair trial. United States v. Johansen, 56 F.3d 347, 350 (2d Cir.1995); United States v. Bertolotti, 529 F.2d 149, 155 (2d Cir.1975).
 
 
 28
 To determine whether the proof supports a finding of a single or multiple conspiracies, we first examine the scope of the proven criminal enterprises to determine whether any of them fits the pattern of the conspiracy alleged in the indictment. Johansen, 56 F.3d at 351 (improper variance where indictment charged single conspiracy but evidence proved only that multiple, unrelated individuals had independently engaged in fraudulent transactions with a single person). We then assess whether the jury could reasonably infer from defendant's conduct that he knowingly took part in the alleged criminal enterprise. Id. In other words, we conduct an inquiry substantially similar to that required to evaluate appellant's claim of insufficiency of the evidence. And, as we have already determined that the proof supports a finding that an agreement existed between Esa, Fernandez, and Nunez--as alleged in the indictment--to sell cocaine to Besho, Fernandez' claim of an improper variance must fail for the same reasons that his insufficiency claim fails.
 
 III Failure to Define Reasonable Doubt
 
 29
 In its instructions to the jury the district court repeatedly advised that the government bore the burden of proving the defendant's guilt beyond a reasonable doubt, although it did not define "reasonable doubt." The following morning, after the jury had already deliberated for approximately three hours, defense counsel brought this omission to the court's attention. While Judge Sprizzo was considering whether to take remedial action, the jury sent him a note indicating it had reached a verdict. The judge then announced he would not accept the verdict, but instead would give a supplemental charge defining reasonable doubt and send the jury back to reconsider its verdict in light of the supplemental instruction. There was no objection to this procedure or the content of the supplemental charge.
 
 
 30
 After deliberating an additional two and a half hours, the jury returned a verdict of guilty against both defendants. Defendants' subsequent motion for a new trial was denied on the ground that defense counsel's failure to object or move for a mistrial prior to the second deliberation waived the issue. On appeal, Fernandez contends that the initial charge's failure to define reasonable doubt impermissibly tainted the jury's deliberations and, further, that he did not knowingly and voluntarily waive his right to a mistrial.
 
 
 31
 Although application of the reasonable-doubt standard in criminal cases is required as a matter of due process, "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994). In fact, it has been observed that attempts to clarify reasonable doubt tend to create more confusion than does the expression itself. Note, Reasonable Doubt: An Argument Against Definition, 108 Harv. L.Rev.1955, 1957 (1995). Because of the difficulty of articulating an acceptable definition, several circuits, including this one, generally discourage trial courts from attempting to define the term. See, e.g., United States v. Ivic, 700 F.2d 51, 69 (2d Cir.1983); United States v. Bruce, 109 F.3d 323, 329 (7th Cir.1997) ("[N]either trial courts nor counsel should attempt to define 'reasonable doubt' for the jury."), petition for cert. filed, --- U.S.L.W. ---- (U.S. June 6, 1997) (No. 96-9271); United States v. Nolasco, 926 F.2d 869, 872 (9th Cir.1991); United States v. Ricks, 882 F.2d 885, 894 (4th Cir.1989); Thompson v. Lynaugh, 821 F.2d 1054, 1060-61 (5th Cir.1987). But see Friedman v. United States, 381 F.2d 155, 160 (8th Cir.1967) (trial courts are required to define reasonable doubt); Blatt v. United States, 60 F.2d 481, 481 (3d Cir.1932) (same). Hence, a trial court's failure to define reasonable doubt cannot, standing alone, constitute reversible error.
 
 
 32
 Instead, jury instructions must be viewed in their entirety to ensure that the instructions, read as a whole, correctly convey the reasonable-doubt concept to the jury. United States v. Birbal, 62 F.3d 456, 462 (2d Cir.1995). We will disturb a conviction only when it appears reasonably likely that the jury understood the instructions to allow it to convict on evidence insufficient to prove every element of the offense charged beyond a reasonable doubt. See Victor, 511 U.S. at 22, 114 S.Ct. at 1251.
 
 
 33
 In the case at hand, the court's initial charge to the jury repeatedly referred to the reasonable-doubt standard. The jury was instructed that "[t]he government bears the sole and exclusive burden of establishing the elements [of the crime] beyond a reasonable doubt" and that "[e]ach [of those elements] must be proved beyond a reasonable doubt." Judge Sprizzo emphasized that "[the] presumption of innocence remains with the defendant ... until such time, if ever, as you, the jury, are convinced that the government has proved all of the elements of the offense against each defendant beyond a reasonable doubt." Thus, even if the court had declined to add the supplemental charge defining reasonable doubt, the original charge adequately conveyed the appropriate standard of proof to the jury.
 
 
 34
 Nor do the circumstances surrounding the two deliberation sessions suggest that the jury failed to apply the correct standard. When the jury returned its first verdict, Judge Sprizzo explained that he could not accept the verdict and delivered a standard instruction on the meaning of reasonable doubt. He then directed the jury to recommence its examination of all the evidence in light of the supplemental instruction and stated again that the government bore the burden of proving each defendant guilty beyond a reasonable doubt. The jurors reached their second verdict after deliberating for an additional two hours--an amount of time comparable to that spent prior to reaching the first verdict--which suggests that they took seriously the admonition to review the evidence de novo, without relying on their initial decision. Absent contrary evidence, we assume the jury followed the judge's instructions and applied the proper standard.
 
 
 35
 Although Fernandez apparently concedes that the substance of the supplemental charge was legally sufficient, he believes the lapse of over 12 hours between the original charge and the "curative" supplemental instruction and the weakness of the government's case against him should be taken into account in determining whether the initial, allegedly improper instruction was cured. Both the timeliness of a trial court's curative measures and the relative weakness of the government's case may be relevant to the prejudice suffered by a defendant as a result of an erroneous instruction. See United States v. Oliver, 766 F.2d 252, 254 (6th Cir.1985) (prejudice caused by erroneous instruction not cured where curative instruction given after defense counsel tailored closing argument to initial, erroneous charge). Yet neither a lapse of time nor the relative persuasiveness of legally sufficient evidence can create prejudice where there was no error initially. Because the trial court's first charge was sufficient and legally correct, appellant was not entitled to any curative measures, timely or otherwise. Prejudice may not be found therefore from the manner in which the trial court took such measures.
 
 
 36
 Fernandez urges he was entitled to a mistrial when the court first discovered the omission of the reasonable doubt instruction from the initial charge. He declares that because he was not specifically offered a mistrial, his waiver of the "right" to a mistrial was not knowing and voluntary. For this proposition, he relies on United States v. Lane, 624 F.2d 1336 (5th Cir.1980), where a trial court that had inadvertently omitted several pages of its jury charge, including a definition of reasonable doubt, offered the defendant his choice of three curative alternatives: (1) a supplemental instruction consisting solely of the omitted portions of the charge, (2) a complete recharging of the jury, including both the instructions already given and those omitted, or (3) a new trial. Id. at 1339. After conferring with counsel, Lane elected the second alternative, but on appeal argued that he had not knowingly and voluntarily waived his right to the third alternative, a mistrial. Id. In affirming his conviction the Fifth Circuit noted that Lane's decision to decline the mistrial option was informed by advice of counsel and was entirely voluntary. Id. at 1340.
 
 
 37
 Lane does not stand for the proposition that trial courts must, sua sponte, offer a mistrial in every case in which the jury charge may have been erroneous. Neither this Circuit nor, to our knowledge, any other has adopted so expansive a rule. Instead, Lane simply reiterates the familiar principle that a waiver not knowingly, intelligently, and voluntarily made will not be enforced. See, e.g., United States v. Ready, 82 F.3d 551, 556 (2d Cir.1996) (waiver of a right must be knowing and voluntary to be effective). Because appellant failed to request a mistrial prior to the jury's second verdict, the refusal to grant him one later is reviewed for plain error. As discussed earlier, the failure to define reasonable doubt was not error, plain or otherwise, and appellant should not now be heard to complain because he had the good fortune to win a curative instruction where none was warranted.
 
 IV Sentencing Issues
 A. Capacity and Intent
 
 38
 Fernandez challenges the calculation of his offense level under the Sentencing Guidelines as having attributed to him an amount of cocaine that he was not capable of producing. The government has the burden of proving facts relevant to sentencing by a preponderance of the evidence, see United States v. Jones, 30 F.3d 276, 286 (2d Cir.1994); United States v. Podlog, 35 F.3d 699, 706 (2d Cir.1994), and a reviewing court will reject a sentencing court's factual findings only when they are clearly erroneous, see United States v. Davis, 967 F.2d 84, 88-89 (2d Cir.1992).
 
 
 39
 The Sentencing Guidelines provide that the offense level of a defendant convicted of a narcotics offense is ordinarily governed by the amount of narcotics involved, U.S. Sentencing Guidelines Manual (U.S.S.G.) §§ 2D1.1(a)(3) & (c), and that quantity ordinarily includes the quantity under negotiation unless the sentencing court finds that the defendant lacked the intent and the ability to produce the negotiated quantity, see U.S.S.G. § 2D1.1, comment. (n.12). Where the government contends that the defendant personally negotiated to produce a contested quantity of drugs, the proof must demonstrate that the defendant intended to produce such an amount. Hendrickson, 26 F.3d at 332. In addition, where ability and intent are at issue, the sentencing court is obligated to make specific findings of fact that the defendant intended to and was reasonably capable of producing the particular quantity for which defendant is being sentenced. See Jacobo, 934 F.2d at 416. The required findings must be sufficient to permit appellate review, a standard that may be satisfied by the sentencing court's adoption of the factual findings in the presentence report. See United States v. Thompson, 76 F.3d 442, 457 (2d Cir.1996).
 
 
 40
 Defendant maintains both that the district court failed to make a sufficiently specific finding as to his ability and intent to produce five kilograms of cocaine and that such a finding, if made, would not be supported by a preponderance of the evidence. The record refutes defendant's first point. When defense counsel raised the issue of Fernandez' capacity to produce the cocaine, the trial court observed that the appropriate offense level depended upon whether defendant had the capacity to deliver the amount alleged and declared that it was "satisfied that [Fernandez and Nunez] had the capacity." When the defendant protested and said he was unable to produce the drugs, the trial judge replied, "I saw the tapes. I tried this case. I don't believe what you are telling me now." Moreover, in his written judgment form Judge Sprizzo expressly adopted the presentence report's factual findings of capacity and intent and its guideline application. The statements at sentencing and in the written judgment are each independently adequate to satisfy the sentencing court's obligation to make findings of fact sufficient to permit appellate review.
 
 
 41
 Appellant's second argument, that the evidence was insufficient to sustain a finding of capacity and intent, essentially reprises his original argument that the conviction itself was rendered without legally sufficient support. Because we have already determined that the evidence presented at trial was sufficient to allow a jury to find capacity and intent beyond a reasonable doubt, we necessarily conclude that a sentencing court considering the same evidence could reasonably find that the government had established capacity and intent under the less stringent preponderance of the evidence standard applied to disputed issues of fact at sentencing.
 
 
 42
 Fernandez asserts that this result is at odds with our holding in Hendrickson, 26 F.3d 321. In that case Customs informants testified that early in the course of an undercover investigation, Hendrickson had proposed a plan to import 50-60 kilograms of heroin from Nigeria, but he later expressly disavowed the plan, explaining that his Nigerian contacts were not interested and that "we don't have the funds to go." Id. at 325. Hendrickson repeatedly rebuffed informants' attempts to revive the 50-60 kilogram importation scheme with promises that the "big deal" would take place later. Id. at 328. Instead, he offered investigators much smaller quantities and after two years had produced a total of only 77 grams of heroin. Id. at 328-29. At sentencing the trial court found Hendrickson both willing and able to produce 50-60 kilograms of heroin and sentenced him accordingly.
 
 
 43
 On appeal, we noted that negotiations ordinarily constitute reliable admissions as to a defendant's intent to produce a particular quantity of narcotics in the course of a conspiracy. Id. at 338 n. 10. But see United States v. Crespo, 982 F.2d 483, 485 (11th Cir.1993) ("Negotiations between [defendant] and [government] agents were not sufficient in themselves to prove capability of [defendant] to actually produce [proposed quantities of narcotics]."). We also held, however, that a sentencing court should consider whether alleged "negotiations" were sufficiently specific as to logistical concerns such as price, quantity, and delivery to constitute a plan rather than an exploratory discussion or "mere puffery," and whether the coconspirators took any action--such as seeking financing or making arrangements for delivery--to procure the narcotics. Hendrickson, 26 F.3d at 338. Because the trial court failed to address the effects of Hendrickson's repeated pre-arrest disavowals of the 50-60 kilogram importation scheme with regard to his ability and intent to produce the amount of heroin charged in the indictment, we remanded for resentencing. Id. at 341.
 
 
 44
 Fernandez contends that Hendrickson should be broadly read to preclude a finding of capacity to produce a particular quantity of narcotics based solely on evidence that the defendant negotiated to produce that amount. Appellant's reading of Hendrickson ignores its explicit acknowledgement that proof of negotiated amounts of narcotics "will often outweigh any post-conviction claims that the defendant lacked either the intent or the ability to produce the contested amount." Id. at 338 n. 10. Thus, we read Hendrickson to hold only that where a defendant disavows a prior representation of his intent and ability to obtain narcotics, the sentencing court must consider those contradictory statements in its assessment of the defendant's capability and intent.
 
 
 45
 In none of the taped conversations presented at trial did Fernandez disclaim his promise to supply Besho with five kilograms of cocaine. In fact, the record was replete with proof of his efforts to assure Besho that he had the cocaine in hand and would produce it as soon as Besho agreed to meet him in Washington Heights. Absent evidence other than Fernandez' own post-arrest assertion that he intended to commit a robbery, the sentencing court was justified in relying on Fernandez' pre-arrest promises to deliver five kilograms of cocaine.
 
 
 46
 Moreover, the negotiations were not the sole evidence on which the court's capacity and intent findings could have been based. The district court was entitled to credit Esa's recorded statements that he had received three ounces (approximately 85 grams) of cocaine from Fernandez and that the latter was expecting a shipment of 20-30 kilograms demonstrated that he had access to large quantities of cocaine and was in the business of selling narcotics. Accordingly, the district court's findings with regard to capacity and intent were not clearly erroneous.
 
 B. Enhancement
 
 47
 Finally, defendant declares the district court chilled his right to testify when it warned him that he risked a sentencing enhancement for obstruction of justice if he insisted on pursuing his claim of lack of intent and capability at a pre-sentencing hearing. Defendant avers this admonition showed that the court had improperly predetermined that the enhancement would apply regardless of the content of defendant's testimony.
 
 
 48
 An enhancement for obstruction of justice may not be imposed in the absence of a specific finding that the defendant testified falsely as to a material issue with the intent to obstruct justice. See United States v. Giraldo, 80 F.3d 667, 680 (2d Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996). These findings must be made independently at the time of sentencing, and do not automatically follow when a defendant's testimony has been rejected by a judge or jury. United States v. Cunavelis, 969 F.2d 1419, 1423 (2d Cir.1992).
 
 
 49
 Defendant's declaration that the sentencing court threatened automatic application of the obstruction enhancement is belied by the record. When defense counsel requested a hearing on the issue of capacity and intent, the trial court reminded him that his codefendant, Nunez, had received an obstruction enhancement after he testified at a similar hearing. Judge Sprizzo offered to hold a hearing if Fernandez wanted one. The judge expressly left open the possibility he might change his mind if defendant's testimony was credible, but told Fernandez there would be "a downside" were he to be impeached. These statements did not threaten an automatic obstruction enhancement had defendant insisted on a hearing. Instead, the trial judge simply advised defendant that, in light of the taped telephone conversations almost certain to be introduced in rebuttal to his testimony, he faced a substantial risk of incurring an enhancement if he testified at such a hearing.
 
 
 50
 We have not held that a sentencing court may not warn a defendant of the possibility of a sentencing enhancement, nor are we inclined to do so in this case. It seems sensible to us for a sentencing court to offer a realistic assessment of the possible, or even probable, negative consequences of pursuing a presentence hearing with respect to a factual issue, provided there has been no predetermination that those consequences will result regardless of the outcome of the requested hearing. Judge Sprizzo's statements show he maintained an open mind as to defendant's credibility. Hence, his warning to Fernandez was not improper.
 
 CONCLUSION
 
 51
 For the reasons stated above, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996, and the appeal is being decided by the remaining two members of the panel, who are in agreement. See Local Rule § 0.14(b)
 
 
 **
 Hon. Jane A. Restani, United States Judge for the Court of International Trade, sitting by designation