173 P.3d 550

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Duke W. HOLT, Defendant–Appellant.**

No. 27924.

Intermediate Court of Appeals of Hawai'i.

Nov. 21, 2007.

---

Taryn R. Tomasa, deputy public defender, State of Hawai'i, on the briefs, for defendant-appellant.

Anne K. Clarkin, deputy prosecuting attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

RECKTENWALD, C.J., WATANABE, and FOLEY, JJ.

Opinion of the Court by WATANABE, J.

Defendant–Appellant Duke W. Holt (Holt or Mr. Holt) appeals from the Judgment entered by the Circuit Court of the First Circuit [1] (the circuit court) on April 27, 2006, convicting and sentencing him for Harassment by Stalking, in violation of Hawaii Revised Statutes (HRS) § 711–1106.5(1) (Supp. 2006).[2] We vacate the sentence portion of the Judgment and remand for resentencing.

## BACKGROUND

On January 5, 2006, Plaintiff–Appellee State of Hawai'i (the State) filed a complaint that charged Holt as follows:

> On or about the 6th day of December, 2005, through and including the 7th day of December, 2005, in the City and County of Honolulu, State of Hawaii, [Holt], with intent to harass, annoy or alarm another person, to wit, [Complaining Witness (CW) ], or in reckless disregard of the risk thereof, did engage in a course of conduct involving pursuit, surveillance, or nonconsensual contact upon [CW] on more than one occasion without legitimate purpose, thereby committing the offense of Harassment by Stalking, in violation of Section 711–1106.5(1) of the [HRS].

---

1. The Honorable Rhonda A. Nishimura presided.

2. Hawaii Revised Statutes (HRS) § 711–1106.5 (Supp.2006) provides, as it did when Defendant–Appellant Duke W. Holt (Holt) allegedly committed the offense, as follows:

     **Harassment by stalking.** (1) A person commits the offense of harassment by stalking if, with intent to harass, annoy, or alarm another person, or in reckless disregard of the risk thereof, that person engages in a course of conduct involving pursuit, surveillance, or nonconsensual contact upon the other person on more than one occasion without legitimate purpose.

     (2) A person convicted under this section may be required to undergo a counseling program as ordered by the court.

     (3) For purposes of this section, "nonconsensual contact" means any contact that occurs without that individual's consent or in disregard of that person's express desire that the contact be avoided or discontinued. Nonconsensual contact includes direct personal visual or oral contact and contact via telephone, facsimile, or electronic mail transmission.

     (4) Harassment by stalking is a misdemeanor.

Trial on the case began on April 18, 2006, and four witnesses testified for the State.

The first witness, CW, who was twelve years old at the time, testified that on December 6, 2005, she left her house at around 6:20 a.m. and was walking alone to Kawananakoa Middle School, carrying her binder and wearing a backpack. CW recalled that when she crossed Liliha Street to get to Kuakini Street, she walked in front of a four-door Mercedes. She testified that she felt "[k]ind of weird, 'cause like [the driver] kept looking at [her]. . . . [He] wouldn't stop looking at [her]." CW identified the driver as Holt.

After crossing the intersection, CW turned left onto Kuakini Street. Later, when she was "by Kuakini Hospital, [she] looked on the side at Kuakini Hospital, and [saw Holt] in the—the parking lot[.]" CW testified that Holt was still looking at her and kept "saying stuff, oh, what's up, hey, baby, eh, where you going, what you doing, and stuff like that."

According to CW, Holt's words made her feel "weird" because he was "a way older person than [her]" whom she "didn't even know." She kept walking on Kuakini Street and didn't look at him. She reported the incident to her homeroom teacher that day, December 6, 2005.

The next day, December 7, 2005, she left her home for school at around the same time but took a different route because she "didn't want to see [Holt]" and "thought [she] was going to bump into [Holt] again so [she] just took another way." As she walked along Sereno Street, a shortcut to her school, she heard a car behind her but did not turn around. CW testified that she kept on walking and then "someone said what's up? Where's McDonald's at?" She turned around and saw "it was the same guy in the Mercedes." The window of the Mercedes was down, and she was on the passenger's side of the car. CW thought he was a lost tourist, and after he came closer, she directed him to the nearest McDonald's by Foodland in Liliha.

After that, CW said, Holt "started asking [her] like, oh, do you have a phone, can I have your number, oh, what's your name, my name's Eric, and stuff like that." CW did not give him her phone number. According to CW, when Holt asked for her name, she replied by saying:

[O]h, I'm in middle school. And he said, oh, it's okay. And then I said, oh, I have a boyfriend. So I thought he was going to go away after that. And then he said it's okay, I just want to be your friend. I can just take you out, go shopping or something.

CW testified that Holt said, "[P]lease, I'm a nice guy. And then he said, oh, I never say please. Come on." Holt then stated that he wanted to take CW shopping and offered her a ride to school. CW did not agree to go with Holt and started to walk away, but Holt "grabbed [her] hand" through the window on the passenger's side. CW testified that she "was just shocked and scared so [she] just stayed still" as Holt told her, "[J]ust tell me a day and time, and then I'll let you go, just meet up with me somewhere." CW stated:

Like he was—he was saying, oh, how about Saturday at 12:00? And I said 12:00 midnight? And then he said why, is that too late? And I said I don't know. And he said what about 12:00 in the afternoon? I just said okay so I can go. And then he said no, that's too early. How about 6:00 in the evening? And I said, oh, okay. I just said yes like fast so I can just go.

CW testified that she lied about having a boyfriend because she "thought he would leave [her] alone." The conversation lasted five to ten minutes. After CW agreed to meet Holt on Saturday at 6:00 p.m., Holt released her and then "went into someone's driveway and turned around[.]" As he did this, he reminded her about their arrangement and then asked her where they should meet. CW recalled that she reported the incident to her homeroom teacher, who said that they needed to call the police. The police arrived that morning.

CW wrote two statements for the police. The first was a one-page statement written on December 7, 2005 (the first statement). The second was a four-and-a-half-page statement written on December 10, 2005 after Holt had been arrested (the second statement). CW explained that the first state-

ment was considerably shorter than the second statement because she was being rushed by her teacher and police officers to finish it "because school was going to start soon."

On cross-examination, Holt confronted CW about various inconsistencies between her trial testimony and her prior written statements. CW admitted that in her first statement, she wrote that the first incident with Holt took place on Lanakila Avenue, rather than Liliha Street, but explained that she was confused by the interviewing officer. CW also explained that in her first statement, she never described being grabbed by Holt because her teacher "kept rushing [her]. The bell was going to ring soon, and [she] still had to finish [her] homework[.]" CW also acknowledged that in her first statement, she wrote that she "didn't answer" when she was asked by Holt "what [her] phone number was, how old [she] was, [her] name, where [she] lived, [and her] school[.]"

Holt then sought to admit into evidence, pursuant to Hawaii Rules of Evidence (HRE) Rule 613 (1993), CW's first statement in order to impeach her regarding inconsistencies in her testimony at trial. The State objected on grounds that the statement was impermissible hearsay, and the circuit court sustained the objection, ruling that CW's testimony was "not inconsistent with her written statement." Holt then argued for the admission of the first statement on grounds that it would be unfair and incomplete for only one document to be admitted, but the circuit court again denied the admission of the first statement. CW later testified that when she wrote her first statement, the police officer "was kind of confusing" her. She also admitted that she did not know the names of the streets in her neighborhood, like Lanakila Avenue and Liliha Street.

Holt confronted CW with inconsistencies between her trial testimony and her second statement, and the circuit court admitted the second statement into evidence as a prior inconsistent statement.[3]

Honolulu Police Department (HPD) Officer Joseph Pagan (Officer Pagan), who was assigned to investigate CW's case, testified next. Based on a written report by HPD Officer David Kaawa (Officer Kaawa), Officer Pagan was on the lookout for an "African American male ... in his 30s, with dreadlock type hair, operating a ... white vehicle." On Saturday, December 10, 2005, Officer Pagan stationed himself at the McDonald's located on the corner of Liliha and North School streets. Officer Pagan testified that at around 6:00 p.m., he saw an "African American male operating a white vehicle enter the parking lot of McDonald's from the Liliha Street side, circle around in the parking lot, and then exit the same way and head up mauka-bound [4] on Liliha Street." (Footnote added.) Officer Pagan "relayed that [information] to [his] supervisor" and a "couple of minutes" later, another officer reported a possible suspect near Bates Street. Officer Pagan testified that when he arrived at Bates Street, he saw Holt and the same white vehicle he had observed earlier.

HPD Officer Erik Yamane (Officer Yamane) stated that on December 10, 2005, he was assigned "to locate a possible suspect in a harassment case." At about 6:00 p.m., he was on Liliha Street in an HPD patrol car when he received information to be on the lookout for a "white ... Mercedes, four-door, traveling mauka-bound leaving from the McDonald's parking lot on Liliha[.]" Officer Yamane testified that as he was driving down Liliha Street, he made a U-turn, saw a vehicle matching the description, and followed it. The Mercedes traveled along Liliha Street and turned right onto Bates Street.

3. Holt then argued for admission of Complaining Witness's (CW) one-page statement written on December 7, 2005 (the first statement) on grounds that it would be unfair and incomplete for only one statement to be admitted. The Circuit Court of the First Circuit (the circuit court) again denied admission of the first statement. This ruling by the circuit court was not challenged on appeal and is thus deemed waived. *State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d

940, 947 (2003) (citing *State v. Ildefonso*, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992); *State v. Hoglund*, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990); and *Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.*, 100 Hawai'i 97, 107, 58 P.3d 608, 618 (2002)).

4. "Mauka" means "inland." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary*, 242 (rev. ed.1986).

Officer Yamane testified that when he followed the Mercedes onto Bates Street, the Mercedes was "in the process of doing a U-turn ... and then had parked on the ... mauka side of the street." Officer Yamane then activated the blue lights on his patrol car and approached Holt's vehicle. Holt was subsequently arrested. Officer Yamane also testified that when Holt was in the back of the officer's patrol car, "[h]e said ... there was this girl [CW] who I spoke to maybe Friday, something to that effect." On cross-examination, Officer Yamane explained that after Holt was placed under arrest, "it appeared that he was trying to figure out what specifically he was being arrested for," and while Holt was being put in the officer's patrol car, Holt said out loud, "[O]h, you know, there was this girl [CW], you know[.]"

HPD Officer Gilbert Yrojo, Jr. (Officer Yrojo) was the last witness for the prosecution. Officer Yrojo testified that on December 10, 2005, sometime after 6:00 p.m., he was assigned to bring CW to Bates Street to determine if she could identify a possible suspect. According to Officer Yrojo, CW "positively identified a [sic] African American male standing on the street next to a white car."

The first defense witness was CW's mother (Mother). She testified that the police came to her home on December 10, 2005 and she related what CW had told her about an incident that occurred while CW was on her way to school. Mother explained to the police that her "English [was] not good enough" but if they helped her, she would tell them "the essence of [the] story[.]" Mother initially could not recall whether she "fill[ed] out the form or [the] police officer help[ed] her]." However, she "remember[ed] very clearly" that she signed a written statement after "the essence" of her statement was reiterated to her by the officer.

Mother testified that the statement she signed was short and did not "cover [the]

whole thing." On cross-examination, she was asked about inconsistencies between her written statement [5] and her testimony at trial. For example, in her written statement, Mother related that CW had mentioned being "touch[ed]" rather than "grabbed" by a man. Mother explained that at the time she signed the statement, she did not know the exact English translation for the Korean word for "grab" and used the word "touch" instead. Over the State's objection, the circuit court admitted that portion of Mother's written statement (Defense Exhibit B) into evidence for the limited purpose of impeaching Mother's testimony at trial.

Holt testified that he lived with his wife in Waikīkī. At the time of the incident, he was working as an "operations manager, slash, head patrolman" for JAN Guard Hawaii. His duties included monitoring security guards at different locations throughout the night to "make sure the guards stay awake[.]" Holt testified that his normal work routine included driving his personal car to a warehouse near Liliha Street and picking up the company truck for night patrolling. When he finishes his work shift, he explained, he removes all of his belongings from the truck and puts them in his personal car, a white Mercedes. Holt said that he typically finished his shift at 6:30 in the morning.

Holt described the interior of his car and stated that he had measured the distance between the middle of the driver's seat to the window on the passenger's side, and the distance was five feet, three inches. Additionally, he had measured the length of his arm (from his shoulder to the tip of his fingers) and the length was two feet, three inches. Holt confirmed that it was physically "impossible" for him to reach across from the driver's seat over the middle console and out the window on the passenger's side. He had

---

5. The written statement that was prepared by Officer Barroga and signed by CW's mother stated:

At about 3–4 p.m. my daughter [CW] told me about a man was following her on the way to school. [CW] related that she [sic] tried to touch my [sic] hand. The man said that she

was pretty and wanted to go shopping. [CW] told me she reported the incident to Kawananakoa Middle School staff. My husband ... can accompany my daughter to court to prosecute this case.

(Crossed-out words omitted.)

tried to do so "last night" and his "finger barely crossed the door."

According to Holt, after his shift ended on the morning of December 6, 2005, he transferred his coffee thermos and backpack from the security truck to his personal car but forgot his water jug. While traveling along Liliha Street he "noticed [he] didn't have [his] water jug. So [he] ... made a U-turn." While making the turn, his coffee spilled onto the floor and seat of his car.

Holt testified that he grabbed a towel he kept in his car

and as [he] was driving, [he] was wiping and trying to get the coffee up, and [he] start[ed] to swerve. So [he] turned right on Elena Street. [He] pulled right on Elena Street, and [he] stopped, and [he] was wiping up [his] coffee.

. . . .

... [A]s [he] almost finished wiping [his] coffee, ... [he] look[ed] up, and there's this female standing maybe like four to five feet away from [his] car.

Holt explained that the female was walking along the passenger's side in front of his car and she had "really long hair[,]" a shirt exposing "the entire belly," and a "white miniskirt." Holt further testified that it was difficult to see her face because it was still "black dark" and "[t]here are no street lights on Elena." The following colloquy ensued:

Q. What do [sic] you do then?

A. I lean out the passenger's side of my window. I asked her excuse me, would you happen to know where McDonald's might be?

Q. And what did she say?

A. She didn't say—she didn't say anything. She walked back towards my car, still on the side, and she started giving me directions.

Q. Okay. And what did you say?

A. I—I interrupted her in the middle of giving her—giving me directions. And I was like no, I know where McDonald's is. I work right back on Pala Street.

According to Holt, CW did not seem afraid and she "laughed the whole time. . . . She just really, really laughed. I mean it was like a hardy—it was like laughing laughing." Direct examination of Holt then continued:

Q. Mh-hm. And were you still in your driver's seat?

A. Hm? Yes, yes. I extended my hand, and I said my name's Duke. And she reached inside of my car. Her shoulder was in my car, and she shook my hand.

Q. Okay.

A. And she said my name is, she said, [CW]. I thought she said [CW]. I said [CW]? She said no, [CW] (phonetic).

Q. [CW]?

A. Yes, she said [CW], I think. She said [CW]. Then she spelled it for me.

Holt testified that he thought CW was "at least 18 or 19" because of "the way that she was dressed." He asked her what she was doing and she replied that she was about to go to a girlfriend's house. He then offered her a ride, but she declined. According to Holt, they talked for "maybe like five to ten minutes" and "the whole time ... she had a smile on her face. . . . [s]he was laughing the whole time. As God is my witness, she laughed the whole time." Holt stated that during his conversation with CW, "McDonald's c[a]me up":

McDonald's came from her. . . . [M]y suggestion was Ala Moana—I said maybe we could meet at Ala Moana at a shop or something and get some ice cream. And she said I got a boyfriend. I said, whoa, I don't know you. I'm not talking about that kind. And then I repeated in pidgin so she could understand. And after I said that, she really became relaxed because it wasn't going that way.

. . . .

... [W]e talked basically a little more. And so I was getting tired. So I said—I said so what's up? She said how about we meet at McDonald's? I said at McDonald's? No, she said how about we meet at McDonald's? I said at McDonald's? She's like, oh, yeah, you don't know where McDonald's is, huh? And then we laughed again.

And then she said how—after we laughed, she said how about 12 o'clock? I said 12 o'clock at night? She said yeah, I

**410**

can come out anytime I want to. I said 12 o'clock at night, I'll be asleep. I work—I work at night all week, and I have to work like almost a double on Thursday so I'll be asleep. And she said, well—she said how about 12-12:00 in the afternoon? She said how about 12—I said how about 12:00 in the afternoon? She's like no, no, 12:00 is Saturday. 12:00 in the afternoon, it'll be Saturday. I'll be still asleep, what she said.

I said I come—I come up here every Saturday to wash my car so 6:00 would be a good time. She said 6:00? She said 6:00, uh—uh, I don't know. Uh, I don't—I said wait, I'm not talking about boyfriend-girlfriend kind. She's like no, no, no, I'm not talking about that. I might be with my girlfriends. So I said bring them with you. She's like really? I said yeah, I don't care. Bring them with you. She said I can't—I'm not promising anything, but if we have time, we'll stop by.

I said I tell you what. At 6 o'clock, I cruise to McDonald's, and if you're there—if you're there, we'll hang out, get some ice cream or whatever. She said okay, but I'm not promising. I said it's totally up to you. I'm not trying to make you do anything. It's totally up to you. She said, oh, okay, well, if I can, we will.

And then basically, we said goodbye. She said goodbye, reached into my car, and she shook my hand again.

Holt explained that the entire time they were talking, his car was in the street, the engine was running, and there was a bus stop about fifteen to twenty feet away with a lot of people. At one point, "the police turned in, ... hit this thing, whoop, and it scared both of us so bad, you know what I mean." Holt said that he apologized to the police because he was in the street, and CW moved away from the car so Holt could move it. Thereafter, CW "came back to the car, and we continued to talk." Holt testified that at the end of their conversation,

I told her, I said—I say hey—she had to—what she did, she moved away from the car because there were cars on both sides, a small street.... So I had to wait until she was completely out of the way. She went

like 20—15, 20 paces. And she turned around and wave—was starting to wave. So as—I—I pull into the driveway and turn around, and now I can see her face. I can—I can—I can see her face really now. I say, hey, how old are you? And she tells me, oh, yeah, I know, McDonald's at 6:00 if I can. So I'm like I'll see you Saturday. So I back out of the driveway, and then I go back to the office, get my water jug, and then ... I go home.

Holt denied asking for CW's phone number, although he admitted asking her if she had a cell phone. "I was going to call my boss's—my boss's brother who lives at the warehouse and have him pick my water jug up." He denied seeing CW in a crosswalk on any of the days in question, saying "hey, baby" to her, following her in his car, and grabbing her. Holt stated, "I would never—I don't get dates that way. That's not the way to get a date. To me, that's ridiculous." Holt also testified that CW did not have any books or a backpack with her and if he had known that she was twelve, he "would have burned rubber."

Officer Kaawa testified next. He interviewed CW in the parking lot of her school on December 7, 2005 at "[r]oughly around 6:30 in the morning." He testified that he had trouble eliciting a statement from CW because "she seemed a little uptight, you know, little frightened" and "nervous." Officer Kaawa testified that it took a while "to get everything out of her" because he "had to calm her down first[.]" Officer Kaawa stated that CW was trying to "explain roughly" where the incident happened, but "she really didn't know streets."

She was trying to explain from where she lived. I think she said the Lanakila Health Center, the area. She was coming down from Kunawai Lane where she lived so. Tried to explain to her is that right around that corner area? She said by Lanakila Elementary School[.]

Officer Kaawa further testified that he "had to kind of help [CW] out" and that he had difficulty "getting the specifics out of [CW] so [he] had to be real patient with her." Basically, he said CW could only describe the

person and car involved as "a Black male and a small white car[.]"

Officer Kaawa testified that when he asked CW if the male had grabbed her to pull her into his car, she responded that he didn't try to grab her but touched her hand to get her attention and asked her some questions. Officer Kaawa further stated that CW did not tell him whether the touching was friendly or aggressive, but "as far as she was concerned, it wasn't something that she invited[,] ... [so] she pulled away when he tried to reach out and touch her." He explained that he asked CW about the way Holt touched her "to make sure [he] didn't have a [sic] abduction or possible attempted kidnapping kind of case." Officer Kaawa testified that CW filled out a report of the incident in her own handwriting, then signed and dated the report at the bottom after he had read it back to her to make sure it was accurate.

At the close of evidence, the circuit court instructed the jurors "concerning the law which [they] must follow in arriving at [their] verdict." The parties then presented closing arguments. While the jurors deliberated, the circuit court called a bench conference to address six jury instructions [6] that had been proposed in writing by defense counsel on March 6, 2006, more than a month and a half before trial but not raised during the oral settling of jury instructions. Defense counsel withdrew five of the proposed instructions and requested that the jury be given a mistake-of-fact instruction. The following discussion then took place:

THE COURT: The court will give defendant's proposed juror instruction 7.13 over objection by the State.

. . . .

The defendant's proposed jury instructions does not set forth—is going to be read as follows: In any prosecution for an offense, it is a defense that the defendant engaged in the prohibited conduct under ignorance or mistake of fact if the ignorance or mistake negates the state of mind required to establish an element of the

offense. The burden is upon the prosecution to prove beyond a reasonable doubt that the defendant was not ignorant or mistaken as to a fact that negates the state of mind required to establish an element of the offense. If the prosecution fails to meet its burden, then you must find the defendant not guilty.

This is what you have proposed, [Defense Counsel], in terms of 7.13. However, when we look at the consent issue, it's not actually an element of the offense. It is a defense. Correct?

[DEFENSE COUNSEL]: Yes, Your Honor.

. . . .

THE COURT: ... With respect to defendant's proposed juror instruction 7.13, it'll be modified over objection by the State. . . .

. . . .

The modification is in lieu of "the state of mind," "negates an element of the offense" which applies to both the first paragraph and the last paragraph. So it will read to negate an element of the offense as opposed to negating the state of mind.

. . . .

In terms of the procedure that will be followed, this is as follows. We will be xeroxing a complete set of instructions with the additional jury instruction. The court will insert it accordingly. The court will reconvene the jury, inform the jury to give back its jury instruction, and the court will replace it with a new set of jury instructions, and I'll go right into reading and having them apply the law. And I will read the set with that without giving any undue emphasis and then inform the jury that the court will allow the attorneys to supplement their closing. Both sides will have five minutes. . . . And then they can resume their deliberations with a new set of jury instructions.

Both parties agreed to this procedure. At the State's request, the circuit court prohibit-

---

6. The record on appeal indicates that on March 6, 2006, defense counsel filed Defendant's Proposed Jury Instructions, requesting "that the Court instruct the jury at the close of evidence and argument on the points of law as set forth in H.A.[W.]J.I.C. [ (Hawaii Jury Instructions—Criminal) ] numbers 3.09, 3.10, 3.13, 4.07, 7.05, 7.13."

ed the parties from mentioning the particular instruction that had not been read to the jurors the first time so that the jury would not "give any undue emphasis or . . . conjecture as to . . . which of all the jury instructions may be different."

The circuit court then recalled the jury and stated:

At this time, ladies and gentlemen of the jury, I want you to pass down your jury instructions—oh, it's been left. Okay.

The court will instruct you now concerning the law which you must follow in arriving [sic] your verdict.

This is a new set of jury instructions so I need you to pay close attention. Take it out.

The circuit court then began reading the new set of jury instructions. After reading page fourteen of the instructions that stated, "The defendant has no duty or obligation to testify, and you must not draw any inference unfavorable to the defendant[,]" the circuit court immediately ordered the jurors to remove page fourteen:

This should be removed. Page 14 should be removed. If everyone could remove page 14.

Defendant in this case has testified. When a defendant testifies, his credibility is to be tested in the same manner as any other witness.

You must disregard entirely any matter which the court has ordered stricken.

In reading the ignorance-or-mistake-of-fact instruction, the circuit court stated:

In any prosecution for an offense, it is a defense that the defendant engaged in the prohibited conduct under ignorance or mistake of fact if the ignorance or mistake—should be mistake of fact negates an element of the offense.

The burden is upon the prosecution to prove beyond a reasonable doubt that the defendant was not ignorant or mistaken as to a fact that negates an element of the offense. If the prosecution fails to meet its burden, then you must find the defendant not guilty.

So therefore, jury, if you'll look on line two, after mistake, it should be or mistake of fact.

After reading all the instructions and allowing counsel to make supplemental closing arguments, the circuit court ordered the jurors to "continue [their] deliberations[.]"

During the continued deliberations, Holt moved twice for mistrial on grounds that the instructions on the nonconsensual-contact elements of the offense of Harassment by Stalking, combined with the instructions on the defenses of mistake of fact and consent, were confusing and the jury was not following them. The motions were denied. The jury found Holt guilty as charged.

At the sentencing hearing on April 27, 2006, the circuit court, over Holt's objection, sentenced Holt to serve one year of probation, subject to various special conditions, including the following:

C. Serve a term of imprisonment of 120 days, with credit for time served and to run concurrently with any other sentence [Holt] is serving. . . .

. . . .

G. Participate satisfactorily in the Hawaii Sex Offender Treatment Program (HSOTP) with the provision that [Holt] obtain and maintain sex offender treatment, as approved by [his] probation officer, at [his] own expense until clinically discharged with the concurrence of [his] probation officer. Monthly progress reports are to be submitted to [his] probation officer by [his] therapist. If [his] probation officer deems [him] to be financially unable to pay, [Holt] shall participate in treatment with a Judiciary contracted therapist with payment to be made in accordance with the Adult Probation Division payment formula[.]

Holt objected to participation in the Sex Offender Treatment Program (SOTP), arguing that there was nothing in the record to indicate that he required SOTP. The following colloquy between Holt's counsel and the circuit court then ensued:

[DEFENSE COUNSEL]: . . . With regards to—I wasn't sure if the State—the

court was saying that Mr. Holt should get an assessment and then treatment if necessary or treatment.

THE COURT: To participate in the treatment.

[DEFENSE COUNSEL]: Your Honor, then if Mr. Holt is assessed and deemed not to be any sort of a threat to—

THE COURT: I'll leave it to the discretion of the probation officer, but these are the court's sentencing provisions.

[DEFENSE COUNSEL]: As a recommendation to the probation officer? In other words—

THE COURT: If part of the Hawaii Sex Treatment Program includes an assessment as to determine that type of treatment. The court is not intimately familiar with the kinds of treatment. The court leaves it to the discretion of the probation officer to determine that.

[DEFENSE COUNSEL]: Your Honor, I would object to leaving those types of matters up to the discretion of the probation officer. Sex offender treatment can be a very prolonged and onerous program and whether or not Mr. Holt or society would benefit with Mr. Holt attending would—should be—that decision should be made by the court upon the recommendation of a qualified psychiatrist or psychologist.

THE COURT: [Defense Counsel], I believe you mentioned as part of the sentencing that perhaps [Mr. Holt] could benefit from treatment or counseling. In terms of the nature of the offense, this is the closest in terms of to fit the crime that has been charged and the jury found him guilty beyond a reasonable doubt. Harassment by stalking involved a 12–year–old female.

[DEFENSE COUNSEL]: Yes, your Honor, and I believe I asked the court for an assessment and treatment, if necessary. If that wasn't my words, I would argue them now that it should be an assessment and treatment. Mr. Holt has no prior—no prior allegations of any sort along these lines and no other criminal activity, but especially none along these lines.

Sex offender treatment is an onerous typ[e] of treatment. If he were assessed and the assessment determined that it was not necessary for him to receive the treatment, then I believe that that should be part of the—that should be the sentence, that he doesn't need sex offender treatment. In other words, you're going to burden Mr. Holt with something that may be unnecessary. Right now it's just speculation.

THE COURT: The court finds that it is necessary given that the jury has found him guilty beyond a reasonable doubt as to the offense charged. Again, this is harassment by stalking a 12–year–old female.

Holt timely filed his notice of appeal to this court on April 28, 2006.

## ISSUES ON APPEAL

Holt asserts that (1) the circuit court erred in refusing to admit CW's first statement into evidence as a prior inconsistent statement pursuant to HRE Rule 802.1 (1993); (2) the circuit court's jury instructions were fatally flawed; (3) the circuit court erred in denying Holt's motions for mistrial; and (4) the circuit court abused its discretion in sentencing Holt. We agree with Holt's fourth assertion and thus vacate and remand for resentencing.

## DISCUSSION

A. *The Circuit Court Erred in Refusing to Admit Those Portions of CW's First Statement that were Inconsistent with Her Testimony at Trial, but the Error was Harmless Beyond a Reasonable Doubt.*

The relevant part of CW's first statement reads as follows:

On 12/7/05 at about 6:30 am [sic] [A]frican [A]merican male was in a white car drove up next to me at [L]anakila/[K]uakini [S]treet asked what my phone number was and how old I was, my name, where I live, my school, I didn't answer, but he said that if I tell him what day and time we can go out and he'll go away[. H]e told me to meet him at Mcdonalds [sic] at 6:00, pm [sic] in the evening[. H]e told me his name was Eric, he also drove real close

and put his hand on my hand and I pulled my hand away[. H]e kept telling me remember about [S]aturday. I also seen him 12/06/05 honking the horn at me and saying hey baby and at the same area and time, I feel scared and harrased [sic][.] I am willing to prosecute[.]

(Emphases added.) At trial, Holt argued that the foregoing statement should be admitted into evidence as a prior inconsistent statement pursuant to HRE Rule 613. On appeal, Holt argues that the statement was also admissible as substantive evidence pursuant to HRE Rule 802.1.

■ A trial court's evidentiary rulings pursuant to HRE Rules 613(b) and 804(b) (1993) are reviewed on appeal pursuant to the *de novo* or right/wrong standard. *State v. Ortiz*, 91 Hawai'i 181, 189–90, 981 P.2d 1127, 1135–36 (1999). Applying this standard, we agree with Holt that the circuit court erred in precluding entry of the underscored portions of CW's first statement into evidence.

HRE Rule 613 provides, in relevant part, as follows:

**Prior statements of witnesses. ...**

(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

Contrary to the circuit court's ruling, the portions of CW's statement that are underscored above were inconsistent with CW's testimony at trial. Moreover, on cross-examination, Holt's counsel brought the underscored portions of the first statement to CW's attention and asked CW whether she made those assertions. Thus, Holt laid the foundation for introducing the prior inconsistent statements and should have been permitted to admit them into evidence for im-

peachment purposes pursuant to HRE Rule 613(b). *See State v. Duncan*, 101 Hawai'i 269, 278, 67 P.3d 768, 777 (2003) (holding that the trial court erred in admitting extrinsic evidence of inconsistent statement for impeachment purposes because prosecutor failed to lay proper foundation under HRE Rule 613).

■ Prior inconsistent statements, although hearsay,[7] may be admitted as substantive evidence if they meet one of the exceptions set forth in HRE Rule 802.1. That rule provides, in relevant part:

**Hearsay exception; prior statements by witnesses.** The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

(1) Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in compliance with rule 613(b), and the statement was:

(A) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or

(B) *Reduced to writing and signed or otherwise adopted or approved by the declarant;* or

(C) Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement[.]

(Emphasis added.) HRE Rule 801 (Supp. 2006) defines "[d]eclarant" as "a person who makes a statement." "Statement" is defined as "an oral assertion, an assertion in a writing, or nonverbal conduct of a person, if it is intended by the person as an assertion." HRE Rule 801 (Supp.2006).

---

7. "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hawaii Rules of Evidence (HRE) Rule 801 (Supp 2006).

Pursuant to HRE Rule 802 (1993), "[h]earsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawaii supreme court, or by statute."

The Commentary to HRE Rule 802.1 explains partly that

[t]his rule should be understood in connection with Rule 613, "Prior statements of witnesses." Rule 613(b) governs the use of prior inconsistent statements for impeachment purposes.... The present rule, in contrast, defines those prior statements by witnesses that may in addition be considered by the trier of fact to prove the truth of the matters asserted, that is, as exceptions to the hearsay ban of Rule 802.

. . . .

The "Jencks Act" governs the production or discovery, in federal criminal trials, of written or recorded statements made to government agents by government witnesses. Subdivision (e)(1) statements are those "signed or otherwise adopted or approved" by a witness. Subdivision (e)(2) statements, although not signed or approved by the witness, are "substantially verbatim" written or recorded accounts of oral statements made "contemporaneously with the making" of the oral statements. The language of subdivisions (e)(1) and (e)(2) is virtually the same as that of paragraph (1)(B) and (C) of the present rule. The purpose of subdivisions (e)(1) and (e)(2) of the Jencks Act, according to the Supreme Court in *Palermo v. United States*, 360 U.S. 343, 349–52[, 79 S.Ct. 1217, 3 L.Ed.2d 1287] (1959), is to define the "most trustworthy class of statements" of witnesses to be turned over to the defense for impeachment purposes....

The trustworthiness of statements defined in paragraph (1)(A), (B), and (C) is further assured by the requirement that the witness-declarant be "subject to cross-examination concerning the subject matter of the statement." The situation envisioned is one where the witness has testified about an event and his [or her] prior written statement also describes that event but is inconsistent with his [or her] testimony. Since the witness can be cross-examined about the event and the statement, the trier of fact is free to credit his [or her] present testimony or his [or her] prior statement in determining where the truth lies. Because the witness is subject

to cross-examination, the substantive use of his [or her] prior inconsistent statements does not infringe the sixth amendment confrontation rights of accused in criminal cases, *see California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

In *State v. Eastman*, 81 Hawai'i 131, 913 P.2d 57 (1996), the Hawai'i Supreme Court held that for a prior inconsistent statement to be admissible as substantive evidence, the following are required by HRE Rule 802.1(1)(B) (1993):

(1) a witness must testify about the subject matter of his or her prior statements so that the witness is subject to cross-examination concerning the subject matter of those prior statements; (2) the witness's prior statements must be inconsistent with his or her testimony; (3) the prior inconsistent statements must be reduced to writing and signed or otherwise adopted or approved by the witness; (4) the prior inconsistent statements must be offered in compliance with HRE Rule 613(b) (1993), which requires that, on direct or cross-examination, the circumstances of the prior inconsistent statements have been brought to the attention of the witness, and the witness has been asked whether he or she made the prior inconsistent statements.

*Id.* at 137, 913 P.2d at 63. Subsequently, in *Ortiz*, the supreme court held that where only portions of a witness's prior written statement are inconsistent with the witness's testimony at trial, only the inconsistent portions are admissible into evidence. *Ortiz*, 91 Hawai'i 181, 194, 981 P.2d 1127, 1140. Therefore, "[w]here the information in the written or recorded statement goes beyond the scope of direct or cross-examination, ... that information must be redacted before the rest of the written statement may be admitted." *Id.* at 194 n. 15, 981 P.2d at 1140 n. 15.

In this case, the record on appeal reveals that Holt met the *Eastman* requirements. Specifically, (1) CW testified on direct examination about the December 6 and 7, 2005 incidents involving Holt; (2) parts of CW's testimony were inconsistent with portions of her first statement; (3) CW admitted on cross-examination that she wrote the first

statement and signed it; and (4) the prior inconsistent statements were offered in compliance with the foundational requirements of HRE Rule 613(b). Pursuant to *Ortiz*, therefore, those portions of CW's first statement that were inconsistent with her testimony at trial should have been admitted as substantive evidence at trial, and the circuit court erred in concluding otherwise.

The Hawai'i Supreme Court has stated, however, that

> error is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction.

*Duncan*, 101 Hawai'i at 278, 67 P.3d at 777 (quoting *State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (per curiam)).

■ After examining the circuit court's error in light of the entire proceedings, we are convinced that the circuit court's failure to admit those portions of CW's first statement that were inconsistent with her trial testimony did not contribute to Holt's conviction.

CW was cross-examined at trial about some inconsistency between her first statement and her trial testimony. She also explained that she was unfamiliar with the names of the streets in her neighborhood and felt pressured to complete the written statement so she could finish her homework and go to class. Officer Kaawa's testimony corroborated CW's confusion about the facts. Officer Kaawa also testified about the difficulty he had getting CW to explain what had transpired and where. Thus, even though the portions of CW's first statement that were inconsistent with her trial testimony were not admitted into evidence, the jury was made well aware that the inconsistencies existed. We are convinced that the failure to admit the inconsistent portions of the first statement did not contribute to Holt's conviction and, therefore, was not reversible error.

## B. *The Circuit Court did not Commit Plain Error in Instructing the Jury.*

Although Holt approved both sets of instructions given to the jury, he now argues that "individual errors in the jury instructions, as well as the cumulative impact of the trial court's errors, constituted reversible error." Holt alleges that (1) the circuit court failed to ensure that the jury had a correct set of written instructions; (2) there is no record that the incorrect initial set of jury instructions was relinquished; (3) there is no indication that the jury instruction that the circuit court erroneously included in the second set of jury instructions and directed the jurors to remove from their set was actually removed from the set; (4) the circuit court failed to provide the jury with a written copy of the ignorance-or-mistake-of-fact defense instruction that incorporated the court's oral amendments; (5) the circuit court failed to stop jury deliberations when it realized that the initial set of instructions was missing an applicable defense; (6) the circuit court erroneously prohibited counsel from explaining that the ignorance-or-mistake-of-fact defense instruction was missing from the original set of jury instructions; and (7) the circuit court erred in failing to instruct the jury to disregard its prior instructions and begin its deliberations anew.

The Hawai'i Supreme Court has stated the following with respect to jury instructions:

> [w]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction. If

there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

In *State v. Eberly*, 107 Hawai'i 239, 112 P.3d 725 (2005), we observed that

> where instructions were not objected to at trial, if the appellant overcomes the presumption that the instructions were correctly stated, the rule is that such erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*State v. Frisbee*, 114 Hawai'i 76, 79–80, 156 P.3d 1182, 1185–86 (2007) (quoting *State v. Nichols*, 111 Hawai'i 327, 334–35, 141 P.3d 974, 981–82 (2006)) (citations, brackets, and ellipses omitted). Based on our review of the record, we conclude that the circuit court did not plainly err in instructing the jury.

### 1.

▮ Holt does not allege that the substance of the circuit court's second set of jury instructions was wrong. Relying on *United States v. Desimone*, 119 F.3d 217 (2d Cir. 1997), he claims that the circuit court erred in not promptly stopping deliberations once it realized that an ignorance-or-mistake-of-fact instruction was not included in the initial set of instructions, thus allowing "individual jurors to become set in their positions."

In *Desimone*, the jury had begun deliberating when defense counsel noted to the trial court that it had failed to instruct the jury on reasonable doubt. *Id.* at 225. While the judge considered whether to take remedial action, the jury reached a verdict. The judge refused to accept the verdict, gave the jury a supplemental instruction defining reasonable doubt, and sent the jury back to reconsider its verdict in light of the supplemental instruction. *Id.* There was no objection to the substance of the supplemental instruction. *Id.* After deliberating for two-and-a-half hours, the jury returned a guilty verdict. *Id.*

The United States Court of Appeals of the Second Circuit (the Second Circuit) initially observed that

> [a]lthough application of the reasonable-doubt standard in criminal cases is required as a matter of due process, "the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."

*Id.* at 226 (quoting *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)). Therefore, the Second Circuit said, the trial court did not have to instruct the jury with regard to reasonable doubt and its failure to do so initially was not reversible error. *Id.* at 227. The Second Circuit acknowledged that "the timeliness of a trial court's curative measures and the relative weakness of the government's case may be relevant to the prejudice suffered by a defendant as a result of an erroneous instruction." *Id.* However, the Second Circuit held that since "the trial court's first charge was sufficient and legally correct, [the] appellant was not entitled to any curative measures, timely or otherwise." *Id.* Accordingly, a twelve-hour lapse between the original charge and the curative supplemental instruction is not prejudicial. *Id.*

Similarly, in *Commonwealth v. Sanna*, 424 Mass. 92, 674 N.E.2d 1067 (1997), the jury, after one or two hours of deliberating, asked the judge for clarification of an instruction on malice that had been given over the defendant's objection. The trial court then gave the jury a supplemental charge. *Id.* at 1076. The Supreme Judicial Court of Massachusetts held that "[t]he fact that the judge clarified his instruction after two hours of jury deliberation is not fatal to the Commonwealth's cause." *Id.* (citing *Commonwealth v. Gilliard*, 36 Mass.App.Ct. 183, 191, 629 N.E.2d 349 (1994)).

In this case, the circuit court, in its initial charge to the jury, failed to include an ignorance-or-mistake-of-fact instruction that pertained directly to Holt's defense. However, the circuit court included such an instruction in its second charge to the jury, asked the jurors to "pass down" the first set of instructions, and informed the jurors that "[t]his is a

new set of jury instructions" that they must follow in arriving at their verdict. After reading the second charge to the jury, the circuit court allowed counsel for both sides additional time for closing arguments and the jury continued its deliberation. There is no indication that the time lapse prejudiced the jury.

### 2.

■ The circuit court did not plainly err when it ordered the jurors to remove an extraneous jury instruction regarding a defendant's right to refuse to testify. Since Holt did testify in this case, the instruction was unnecessary and the circuit court's direction to the jurors that they remove the instruction from their second set of instructions could not possibly have prejudiced Holt.

■ The circuit court also did not plainly err in instructing the jurors to correct the written ignorance-or-mistake-of-fact instructions by adding the words "of fact" after the second "mistake" in the first sentence of the instruction. Even without the added words, it was quite clear that the second "mistake" in the instruction referred to the antecedent "mistake of fact" that appeared in the same sentence.

Courts in other jurisdictions have held that extraneous and irrelevant instructions that do not mislead a jury are "not a substantial defect that would render the trial fundamentally unfair or excuse defendant's failure to object to the instruction at trial." *People v. Palmer*, 352 Ill.App.3d 891, 894, 288 Ill.Dec. 12, 817 N.E.2d 137, 140 (2004); *see also United States v. Bailey*, 405 F.3d 102, 111 n. 4 (1st Cir.2005) (extraneous instruction is "not substantively wrong" when its language is legally correct).

### 3.

■ Finally, we conclude that the circuit court did not commit reversible error by not ordering the jury to "deliberate anew" after receiving the second set of instructions. Holt argues that in *State v. Stanley*, 120 Wash.App. 312, 315, 85 P.3d 395, 397 (2004), the Washington Court of Appeals held that a jury that acquired an alternative juror in the middle of deliberations must be instructed to "begin deliberations anew." *Id.* at 315, 85 P.3d at 397.

However, the *Stanley* case is clearly distinguishable because it dealt with a jury that had to be reconstituted with an alternate. *Id.* at 314, 85 P.3d at 396. The prejudice that results from an uninstructed juror entering jury deliberations during the middle of deliberations is wholly absent from this case. Moreover, the trial court's duty "to see to it that the case goes to the jury in a clear and intelligent manner" was clearly not compromised. *See State v. Kupihea*, 98 Hawai'i 196, 204, 46 P.3d 498, 506 (2002) (quoting *State v. Culkin*, 97 Hawai'i 206, 214, 35 P.3d 233, 241 (2001)).

C. *The Circuit Court did not Abuse its Discretion in Denying Holt's Motion for Mistrial.*

Holt argues that because of the several errors related to the jury instructions, the circuit court abused its discretion in denying his motion for mistrial. As indicated above, the errors, if any, did not constitute plain error. Therefore, we conclude that the circuit court did not abuse its discretion in denying Holt's motion for mistrial.

D. *The Circuit Court did not Abuse its Discretion in Sentencing Holt to 120 Days of Imprisonment but did Abuse its Discretion in Sentencing Holt to Participate in the SOTP.*

The circuit court imposed a number of discretionary conditions on Holt in sentencing him to a one-year term of probation. On appeal, Holt contends that the circuit court abused its discretion when it required him to serve 120 days in jail and undergo SOTP as conditions of his probation sentence.

The Hawai'i Supreme Court has stated that

[t]he authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed.

*Barnett v. State*, 91 Hawai'i 20, 26, 979 P.2d 1046, 1052 (1999) (quoting *State v. Davia*, 87 Hawai'i 249, 253–54, 953 P.2d 1347, 1351–52 (1998) (internal quotation marks omitted)).

> Factors which indicate a plain and manifest abuse of discretion are arbitrary or capricious action by the judge and a rigid refusal to consider the defendant's contentions. And, generally, to constitute an abuse it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Rauch*, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (quoting *Keawe v. State*, 79 Hawai'i 281, 284, 901 P.2d 481, 484 (1995)) (citations, internal quotation marks, and brackets omitted).

We examine whether the circuit court abused its discretion in sentencing Holt according to the foregoing standards.

### 1.

At the time Holt was sentenced, HRS § 706–624 (1993) provided, in relevant part, as follows:

> **Conditions of probation**....
>
> ....
>
> (2) Discretionary conditions. The court may provide, as further conditions of a sentence of probation, to the extent that the conditions are reasonably related to the factors set forth in section 706–606 and to the extent that the conditions involve only deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 706–606(2), that the defendant:
>
> > (a) Serve a term of imprisonment not exceeding ... six months in misdemeanor cases ...;
> >
> > ....
> >
> > (k) Undergo available medical, psychiatric, or psychological treatment, including treatment for drug or alcohol dependency, and remain in a specified institution if required for that purpose;
> >
> > ....

> (n) Satisfy other reasonable conditions as the court may impose[.]

The Hawai'i Supreme Court has stated that "[t]he term 'may' in describing the court's power in HRS § 706–624(2) denotes discretion.... The court thus is vested with discretion to impose the conditions set forth in HRS § 706–606, as is also confirmed by the title 'discretionary conditions.'" *State v. Kahawai*, 103 Hawai'i 462, 465, 83 P.3d 725, 728 (2004). The supreme court in *Kahawai* further explained that

> such discretion is not without limits and is expressly circumscribed by the provision that such conditions may be imposed "to the extent that the conditions are reasonably related to the factors set forth in HRS section 706–606 and to the extent that the conditions involve only deprivation of liberty as are reasonably necessary for the purposes indicated in HRS section 706–606(2)." HRS § 706–624(2). This qualification of the exercise of discretion is plain and unambiguous. *See State v. Kalama*, 94 Hawai'i 60, 64[,] 8 P.3d 1224, 1228 (2000) (explaining that "where the statutory language is plain and unambiguous, this court's sole duty is to give effect to its plain and obvious meaning").

*Id.* at 465, 83 P.3d at 728 (footnote call number, brackets, and ellipsis omitted; emphasis added).

HRS § 706–606 (1993) provides:

> **Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:
>
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) The need for the sentence imposed:
>
> > (a) To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
> >
> > (b) To afford adequate deterrence to criminal conduct;
> >
> > (c) To protect the public from further crimes of the defendant; and
> >
> > (d) To provide the defendant with needed educational or vocational train-

ing, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available; and

(4) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

However, notwithstanding the factors a sentencing court shall consider, the supreme court cautioned in *Kahawai* that "[w]ithout some factual grounds in the record, there can be no rational exercise of the court's discretion." *Id.* at 467, 83 P.3d at 730.

In *Kahawai*, no evidence was presented at trial to indicate that the defendant, who had been convicted of violating a protection order relating to her former husband, had a drug or alcohol problem that required court intervention. *Id.* at 463, 83 P.3d at 726. However, the sentencing court ordered, as a condition of probation, that the defendant (1) obtain a substance-abuse assessment from a qualified evaluator selected by her probation officer and undertake the recommended course of treatment until clinically discharged; (2) submit to random testing for drugs and/or alcohol at her own expense within three hours of a request by her probation officer, with failure to submit to testing being considered a positive test result for substance abuse; and (3) not use any narcotic drugs or controlled substances without a prescription. *Id.*, 83 P.3d at 726.

The supreme court acknowledged that a sentencing court " 'is not limited to any particular source of information in considering the sentence to be imposed upon a defendant.' · Hence, information that may be considered by the court is not limited to evidence presented at trial or sentencing." *Id.* at 465, 83 P.3d at 728 (quoting *State v. Murphy*, 59 Haw. 1, 21, 575 P.2d 448, 461 (1978)) (citation omitted). However, in vacating the defendant's sentence and remanding for resentencing, the supreme court said: "[A]rgument of the prosecutor alone would be an insufficient basis upon which the court may rationally exercise its discretion." *State v. Kahawai*, 103 Hawai'i 462, 467, 83 P.3d 725, 730. "In order for there to be a rational

exercise of discretion some factual basis for imposing such probationary conditions must inhere in the record." *Id.* at 466, 83 P.3d at 729.

In *State v. Solomon*, 107 Hawai'i 117, 111 P.3d 12 (2005), the supreme court held that "[i]n imposing sex offender evaluation and treatment as a condition of [the defendant's] probation, the scope of the family court's inquiry must ensure that this condition was 'reasonably related to the factors set forth in HRS § 706–606 and to the extent that it involved only deprivations of liberty or property as are reasonably necessary for the purposes indicated in HRS § 706–606(2).'" *Id.* at 130, 111 P.3d at 25. (Brackets omitted.) The supreme court, upon reviewing the record in *Solomon*, determined that substantial evidence was provided to the family court to support the defendant's history of sexual misconduct and justify the probation condition. *Id.* at 130–31, 111 P.3d at 25–26.

2.

▇ The circuit court here expressly adopted the State's recommendation that Holt be imprisoned for 120 days. The circuit court explained that

[w]ith respect to the term of imprisonment, the court notes that this particular charge is harassment; not only harassment but harassment by stalking. The nature of the offense is such that the allegations in the complaint involved a stalking offense in terms of the defendant having contact with no ligitimate [sic] purposes involving a minor, to wit, a 12–year–old girl, for no ligitimate [sic] purposes.

The defendant had a right to demand jury trial and pronounce his innocence; therefore, he did have a jury trial. The jury found him guilty beyond a reasonable doubt. The verdict was unanimous. There was a jury poll. The court notes that jury communications indicated that the jury thought long and hard with respect to this particular case, but there are certain factors not in dispute.

Number one, the age of the girl. Irrespective of the defendant's perception of the girl being much older, she was twelve

years old at the time. The defendant has also testified that he had been married at the time of these encounters [sic]. Nevertheless, he engaged in a conversation or exchange with an unknown female of a young age, arranged to have a meeting with her.

You don't arrange to have a meeting, even though it sounds innocent on its face, with a female, to wit, a strange female, to wit, a young, strange female. The court finds that this is harassment by stalking. The nature of the offense requires and encourages the court to impose jail. The State's recommendation was 120 days' jail.

The circuit court's rationale for imposing jail time reflected the factors listed in HRS § 706-606. Additionally, the jail time imposed did not exceed the maximum jail term authorized by HRS § 706-663.[8] The circuit court did not clearly exceed the bounds of reason nor disregard rules or principles of law or practice to Holt's substantial detriment in imposing a jail term. Accordingly, the circuit court did not abuse its discretion in sentencing Holt to 120 days' imprisonment.

### 3.

■ On the record before us, however, the condition that Holt participate in SOTP rises to an abuse of discretion. *Solomon* is instructive. In that case, the defendant was found guilty of abusing a family or household member after he tied up his four-year-old nephew by the wrists and ankles and hit his nephew with a belt. *Id.* at 130, 111 P.3d at 25. The family court sentenced the defendant to one year of probation, conditioned on his undergoing sex-offender evaluation and treatment. *Id.*, 111 P.3d at 25. The defendant argued on appeal that because he was not convicted of a sex crime, sex-offender evaluation and treatment was not reasonably related to his character and history. *Id.* at 128, 111 P.3d at 23. The Hawai'i Supreme Court disagreed.

The evidence presented to the sentencing court in *Solomon* indicated that the defen-

dant had a prior conviction of Sexual Assault in the Fourth Degree and had previously handcuffed his daughter to a chair to keep her from violating curfew. *Id.* at 131, 111 P.3d at 26. Additionally, the defendant's four-year-old niece reported that he inappropriately touched her genital area while giving her a bath. *Id.*, 111 P.3d at 26. The defendant also admitted during a polygraph examination that he was discharged from the army for grabbing a high school girl in Germany and since 1993, "has sat in his car and masturbated while looking at girls at the beach or at a park[.]" *Id.*, 111 P.3d at 26. Finally, there were reports that the defendant was "an untreated sex offender who ha[d] not complied with treatment in the past[,]" continued "to engage in sexually abusive behavior[,]" and posed a "risk of being violent, sadistic, and likely to sexually exploit children." *Id.*, 111 P.3d at 26 (brackets omitted). The Hawai'i Supreme Court held that the defendant's history, the circumstances of the defendant's case, and the seriousness of the offense justified the lower court's sentence. *Id.*, 111 P.3d at 26. Accordingly, these factors provided a sufficient factual basis for the sentencing court to impose sex-offender evaluation and treatment as a condition for probation.

In this case, Holt was convicted of Harassment by Stalking, which is not one of the sexual offenses defined in HRS chapter 707, part V or HRS chapter 846E. In sentencing Holt to undergo SOTP, the circuit court focused primarily on the circumstances that gave rise to the charge against Holt—that CW was twelve years old at the time that Holt, a total stranger and a married man, arranged to meet with her. Because the circuit court did not order a presentence report, there was no evidence before the circuit court that Holt had a history of or propensity toward improper sexual behavior. Additionally, the circuit court ordered Holt to undergo SOTP without first requiring an assessment to determine that he required SOTP. Although the circumstances surrounding Holt's conviction suggest that he acted

8.  HRS § 706-663 (Supp.2005) provided, at the time of this misdemeanor offense, that Holt may serve up to one year jail.

inappropriately, the evidence before the circuit court was insufficient to support the condition that Holt participate in SOTP as a condition of probation.

We conclude that the circuit court abused its discretion when it ordered Holt to undergo SOTP as a condition of probation without a sufficient factual basis that was reasonably related to the nature and circumstances of the offense of Harassment by Stalking, of which Holt was found guilty.[9]

## CONCLUSION

Based on the foregoing discussion, we vacate that portion of the Judgment that conditioned Holt's sentence to probation on his participation in SOTP and remand this case with instructions that the circuit court order a presentence report and reconsider the imposition of this condition in accordance with the principles discussed in this opinion.

Although not raised by the parties at trial or on appeal, we also bring to the circuit court's attention HRS § 711–1106.5(2), which provides that "[a] person convicted under this section may be required to undergo a counseling program as ordered by the court."

---

9. In light of this conclusion, Holt's contention that the imposition of a Sex Offender Treatment Program constituted cruel and unusual punishment is moot.

No. 27924, *State v. Holt*, Opinion of the Court by Watanabe, J.